**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| ULTIMATE NUTRITION, INC., | : | |
| Plaintiff, | : | CIVIL CASE NO. |
| | : | 3:23-CV-00677 (JCH) |
| | : | |
| v. | : | |
| | : | |
| LEPRINO FOODS COMPANY, | : | AUGUST 22, 2024 |
| Defendant. | : | |

**RULING ON DEFENDANTS' MOTION TO DISMISS (DOC. NO. 70)**

## I. INTRODUCTION

Plaintiff Ultimate Nutrition, Inc. ("UNI") brings this lawsuit against Leprino Foods Company ("Leprino") pursuant to this court's diversity jurisdiction. UNI alleges violations of Connecticut state contract law and the Connecticut Unfair Trade Practices Act ("CUTPA"), arising out of Leprino's decisions to deny requests for "roll over" deliveries of products UNI purchased, to cancel deliveries where UNI had requested roll overs, and to terminate its business relationship with UNI.

Now before the court is the defendant's Motion to Dismiss, see Motion to Dismiss Plaintiff's Amended Complaint ("Mot. to Dismiss") (Doc. No. 70). The plaintiff opposes the Motion. See Memorandum in Opposition ("Pl.'s Opp") (Doc. No. 89).

For the reasons set forth below, the Motion is denied.

## II. BACKGROUND

A.   Plaintiff's Alleged Facts.[1]

UNI is a Connecticut corporation engaged in the development, sale and distribution of nutritional supplements. See Amended Complaint ¶¶ 1,3 ("Am. Compl")

---

[1] The facts in this section are drawn from the well-pleaded factual allegations in the Amended Complaint. See Amended Complaint ("Am Compl.") (Doc. No. 63).

(Doc. No. 63).  Leprino is a Colorado corporation that produces cheese and dairy products and is one of the largest suppliers of whey protein in the United States.  Id. ¶¶ 2,8.  Prior to September 2021, UNI had an extensive, 25-year business relationship with Leprino in which UNI purchased whey protein from Leprino for use in its products.  Id. ¶ 9.  Throughout the 25-year relationship, UNI paid over $30 million for whey protein and related products.  Id.

UNI alleges it established a course of dealing with Leprino in which UNI would submit purchase orders for whey protein and related products, and Leprino would return corresponding "pro forma invoices" to UNI.  Id. ¶ 11.  UNI purchase orders contained a "projected delivery date," for the protein to be delivered the following quarter.  Id. Beginning in or about 2014, Leprino required UNI to pay cash in advance of Leprino's delivery.  Id. ¶ 12.  UNI alleges that this course of dealing created an "implied-in-fact distribution agreement" between the parties.  Id. ¶ 11.

UNI also alleges that, in a number of instances over the years, UNI would request, and Leprino would allow, UNI to take delivery of the product in the quarter following the scheduled delivery or in future quarters, a practice referred to as a "roll over."  Id. ¶ 13.  UNI alleges that roll overs, or at least good faith negotiations for them, occurred with regularity, particularly in 2021, "and/or became a part of the terms of the parties' contracts as set forth in purchase orders . . . and the corresponding pro forma invoices. . . ."  Id. ¶ 14.

In December 2020, UNI sent 10 purchase orders to Leprino ordering a total of $1,304,541.19 worth of whey protein to be delivered in the first quarter ("Q1") of 2021. Id. ¶ 15.  Leprino issued corresponding pro forma invoices.  Id.  Prior to the close of the

first quarter, Leprino was contacted by a disgruntled unpaid supplier of UNI, who disparaged UNI to Leprino and encouraged Leprino not to do business with UNI.  Id. ¶ 17.  After February 2021, but prior to the close of the first quarter, UNI requested a roll over for nine of its ten Q1 purchase orders, but the request was flatly denied by Leprino.[2]  Id. ¶ 18.

UNI sent 10 more purchase orders to Leprino dated June 11, 2021, which ordered $2,124,677.10 worth of whey protein for delivery in the third quarter ("Q3") of 2021.  Id. ¶ 16.  By September 14, 2021, UNI had not yet taken delivery of the protein it ordered for delivery in Q3, and, in order to determine how much to take, had made repeated requests for Leprino for its fourth quarter pricing ("Q4 pricing").  Id. ¶ 19.  Although a Leprino representative had previously stated they would provide UNI with their Q4 pricing regardless of how much of its Q3 orders UNI "rolled over," they did not provide the Q4 pricing.  Id. ¶ 19.

On September 14, 2021, when UNI had not yet taken delivery of the protein it had ordered for the third quarter, Leprino gave UNI an "ultimatum" that it needed to know within two weeks how much of the protein would be taken by UNI and that, despite UNI's request, it would not allow UNI to roll over any of the orders into the following quarter.  Id. ¶ 20.  When UNI challenged this ultimatum, "as a retaliatory measure," Leprino demanded that UNI inform them how much of the Q3 protein they would be taking delivery of that quarter.  Id. ¶ 21.

UNI alleges that the September 14, 2021 communication "effectively terminated the distribution agreement" between the parties.  Id. ¶ 23.  Leprino cancelled delivery of

---

[2] The Amended Complaint does not allege facts that explain what happened to the Q1 orders after Leprino denied the Q1 roll over request. As a result, it is unclear whether the orders were delivered as scheduled without roll overs, or whether the orders were cancelled by Leprino.

the nine Q3 purchase orders which UNI did not take delivery of in Q3.  Id.  After Leprino

delivered the Q3 product on the remaining purchase order, Leprino notified UNI on

September 29, 2021, that it would not do any further business with them in Q4.  Id.  As a

result, UNI was forced to purchase the rest of their Q3 product from other whey

suppliers at higher prices and suffered a loss of profits.  Id. ¶ 24.

      B.    Procedural Background:

On April 18, 2023, UNI filed the present action in Connecticut Superior Court.

See Complaint, ("Original Compl"), Attach. 1 to Notice of Removal ("Not. of Removal")

(Doc. 1-1).  In the Original Complaint, Counts One, Two, and Three alleged breach of

implied-in-fact distribution, see id. at ¶¶ 1-17, breach of contract, see id. at ¶¶ 18-28,

and breach of the implied covenant of good faith and fair dealing, see id. at ¶¶ 29-32,

respectively.  Count Four alleged violations of CUTPA.  Id. at ¶¶ 33-37.

On May 24, 2023, Leprino removed the lawsuit to federal court.  See Not. of

Removal (Doc. No. 1).  On June 5, 2023, Leprino moved to transfer the case to the

District of Colorado, arguing that a forum selection clause in its "Standard Invoices" was

binding on UNI.  See Motion to Transfer to Another District ("Mot. to Transfer") (Doc. No.

15).  UNI opposed the Motion.  See Memorandum in Opposition to Motion to Transfer

("Pl.'s Transfer Opp.") (Doc. No. 24).

Leprino filed a Motion to Dismiss on June 26, 2023.  See Motion to Dismiss

("Original Mot. to Dismiss") (Doc. No. 22).  On July 10, 2020, UNI filed a Motion for an

Extension of Time to file opposition to Leprino's Motion to Dismiss, which the court

granted.  See Motion for Extension of Time (Doc. No. 21), Order (Doc. No. 23).  On July

27, 2023, UNI filed opposition to Leprino's Motion to Dismiss.  See Memorandum in

Opposition, ("Pl.'s Original Opp") (Doc. No. 31).

On August 10, 2023, UNI moved for leave to file a First Amended Complaint, in order to add a count related to its 2021 Q1 purchase orders.  See Motion for Leave to File First Amended Complaint, ("Mot. for Leave") (Doc. No. 44).  Leprino did not oppose the Motion. See Response re: Motion (Doc. No. 46).

On October 6, 2023, the court, having reviewed the parties' pleadings regarding the Motion to Transfer, requested the parties provide answers resolving outstanding questions of fact.  See Order (Doc. No. 52).  On December 19, the court issued its Ruling denying the Motion to Transfer.  Ruling (Doc. No. 61).  The court found that the forum selection clause Leprino sought to enforce was not part of a valid contract between the parties, and the remaining factors used to evaluate transfer under section 1404 of title 28 of the U.S. Code were not sufficient to overcome UNI's choice of forum. See generally, id.

On December 20, 2023, the court granted the plaintiff's Motion to file an Amended Complaint, without prejudice to Leprino filing a renewed Motion to Dismiss. Order, (Doc. No. 62).  On December 21, 2023, UNI filed its Amended Complaint.  See Amended Complaint ("Am. Compl.") (Doc. No. 63).  Count One of the Amended Complaint alleges breach of the implied-in-fact distribution agreement, see id. at ¶¶ 22-26.  Counts Two and Three allege breach of contract related to the 2021 Q1 and Q3 purchase orders, respectively.  See id. at ¶¶ 27-45.  Counts Four and Five allege a breach of the implied covenant of good faith and fair dealing, and violations of CUTPA, respectively.  See id. at ¶¶ 46-56.

Leprino filed its pending Motion to Dismiss on January 18, 2024.  See Motion to

Dismiss Plaintiff's Amended Complaint ("Mot to Dismiss") (Doc. No. 70), see

Memorandum of Law in Support of Motion to Dismiss ("Def.'s Mem.") (Doc. No. 70-1).

UNI opposes the motion.  See Memorandum in Opposition ("Pl.'s Opp") (Doc. No. 89).

Leprino filed its Reply on March 21, 2024.  See Reply to Response to Motion to Dismiss

("Def.'s Reply") (Doc. No. 98).

## III. LEGAL STANDARD

A.    Rule 12(b)(6)

To withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6),

"a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to

relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting

Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "The plausibility standard is not

akin to a 'probability requirement,' but it asks for more than a sheer possibility that a

defendant has acted unlawfully."  Id.  Reviewing a motion to dismiss under Rule

12(b)(6), the court liberally construes the claims, accepts the factual allegations in a

complaint as true, and draws all reasonable inferences in the non-movant's favor.  See

La Liberte v. Reid, 966 F.3d 79, 85 (2d Cir. 2020).  However, the court does not credit

legal conclusions or "[t]hreadbare recitals of the elements of a cause of action."  Iqbal,

556 U.S. at 678.

In deciding a motion to dismiss under Rule 12(b)(6), the complaint is deemed to

include writings and documents attached to the complaint, referenced in the complaint,

or integral to the complaint.  See Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d

Cir. 2002).  When a claim is for breach of contract, "the complaint is deemed to

incorporate the contract by reference because the contract is integral to the plaintiffs'

claim." Verzani v. Costco Wholesale Corp., 641 F. Supp. 2d 291, 297–98 (S.D.N.Y. 2009), on reconsideration (Aug. 6, 2009), aff'd, 387 F. App'x 50 (2d Cir. 2010).

Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint "relies heavily upon its terms and effect," which renders the document "integral" to the complaint. Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995). The court may also consider "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit". Lee v. Yale Univ., 624 F. Supp. 3d 120, 124 (D.Conn. 2022).

## IV. DISCUSSION

### A.   Choice of Law

Leprino argues that Colorado law should apply to UNI's contract claims. See Def.'s Mem. at 11. UNI disagrees, arguing that Connecticut choice of law principles favor the application of Connecticut contract law. See Pl's Opp. at 9-10. However, neither parties has identified an outcome-determinative conflict between the contract law of Connecticut and Colorado, both of which have adopted the Uniform Commercial Code ("U.C.C."). See Colo. Rev. Stat. § 4-1-101 et seq., Conn. Gen. Stat. § 42-1-101 et seq.

A federal court sitting in diversity follows the choice of law principles of the forum state. Bigio v. Coca-Cola Co., 675 F.3d 163, 169 (2d Cir. 2012). Numerous courts in this Circuit have held that choice-of-law determinations are "fact-intensive inquiries" that are "premature to resolve at the motion-to-dismiss stage." Bristol–Myers Squibb Co. v. Matrix Lab'ys Ltd., 655 F. App'x 9, 13 (2d Cir. 2016) (collecting cases). Moreover, the court "need not 'embark on a choice-of-law analysis in the absence of an actual conflict

between the applicable rules of . . . [the] relevant jurisdictions." Perkins Eastman

Architects, P.C. v. Thor Engineers, P.A., 769 F. Supp. 2d 322, 325 (S.D.N.Y. 2011)

(quoting Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc., 414 F.3d 325, 331 (2d

Cir.2005)).

     In the present case, the parties' briefing on state contract claims cites both

Connecticut and Colorado law and relies on largely identical provisions of the U.C.C.

Neither party has identified an outcome-determinative conflict of law. See Def.'s Mem.

at 11, Pl's Opp. at 9-10.  Upon careful review of the elements of breach of contract[3] and

the elements of a breach of the implied covenant of good faith and fair dealing[4] in

Connecticut and Colorado, the court concludes that there is no substantive conflict that

would trigger a formal choice-of-law analysis for UNI's contract claims.  Accordingly, the

court will apply the substantive law of Connecticut for the purposes of this motion.

     For UNI's statutory CUTPA claim, Leprino argues that the Colorado law should

---

[3] Compare Meyers v. Livingston, Adler, Pulda, Meiklejohn & Kelly, P.C., 311 Conn. 282, 291, 87 A.3d 534, 540 (2014) ("The elements of a breach of contract claim are the formation of an agreement, performance by one party, breach of the agreement by the other party, and damages."), with W. Distrib. Co. v. Diodosio, 841 P.2d 1053, 1058 (Colo. 1992) ("a party attempting to recover on a claim for breach of contract must prove the following elements: (1) the existence of a contract, (2) performance by the plaintiff or some justification for nonperformance, (3) failure to perform the contract by the defendant, and (4) resulting damages to the plaintiff (internal citations omitted).")

[4] Connecticut law and Colorado law both recognize an implied covenant of good faith and fair dealing and similarly define a breach. Compare M&T Bank v. Lewis, 349 Conn. 9, 34, 312 A.3d 1040, 1056 (2024), ("To constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith. (Internal citations and quotation marks omitted.)") with Amoco Oil Co. v. Ervin, 908 P.2d 493, 498 (Colo. 1995), ("Good faith performance of a contract involves 'faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.")

apply and that UNI's CUTPA claim should be dismissed on those grounds alone.[5]  Def.'s Mem. at 12.  UNI counters that, although many of the alleged violations took place in Colorado, choice-of-law analysis nonetheless favors the application of Connecticut law. Pl.'s Opp. at 11.

The court notes at the outset that, in their moving papers, Leprino does not identify a material conflict between CUPTA and the corresponding law of Colorado.  See generally, Motion to Dismiss.  "The threshold choice of law issue in Connecticut, as it is elsewhere, is whether there is an outcome determinative conflict between applicable laws of the states with a potential interest in the case."  Cohen v. Roll-A-Cover, LLC, 131 Conn. App. 443, 465–66, 27 A.3d 1, 16 (2011).  "If not, there is no need to perform a choice of law analysis, and the law common to the jurisdiction should be applied." Chien v. Skystar Bio Pharm. Co., 623 F. Supp. 2d 255, 262 (D. Conn. 2009), aff'd, 378 F. App'x 109 (2d Cir. 2010).  Because the defendants have failed to indicate in their Motion to Dismiss how the application of Colorado law would have conflicted with CUTPA, the choice of law analysis in inappropriate here.  See Roll-A-Cover, 131 Conn. App. at 466 (declining to conduct a choice of law analysis because defendants failed to identify a conflict between CUTPA and the law of another state).  For UNI's CUTPA claim, the court will proceed under Connecticut law without prejudice to Leprino raising conflict-of-law arguments at the summary judgment stage or a later stage.

The court must then turn to the separate but related question of whether CUTPA

---

[5] Leprino mischaracterizes the court's prior Ruling on the Motion to Transfer, (Doc. No. 61), when it claims the court has already determined that "Colorado has the most significant relationship to the dispute." Def.'s Mem. at 12, citing Ruling (Doc. No. 61) at 19-20. In its Ruling, the court did not undertake the "most significant relationship" test frequently used in conflict-of-law determinations. See §§ 6(2) and 145(1) of the Restatement (Second) of Conflict of Laws. Instead, the court applied a different multi-factor test to determine whether venue transfer was appropriate under section 1404 of title 28 of the U.S. Code. While the court noted that "most of the operative facts, as alleged in the Complaint, occurred in Colorado," see (Ruling at 20), the court did not reach the issue of which state's substantive law to apply.

has the territorially scope to reach allegedly unfair acts which took place in Colorado. While the plain language of CUPTA is directed at unfair competition taking place "in this state", Conn. Gen. Stat. § 42–110a(4), courts in this District have held that "CUTPA does not require that a violation actually occur in Connecticut, if the violation 'is tied to a form of trade or commerce intimately associated with Connecticut', or if, where Connecticut choice of law principles are applicable, those principals dictate application of Connecticut law." Victor G. Reiling Assocs. & Design Innovation, Inc. v. Fisher-Price, Inc., 406 F. Supp. 2d 175, 200 (D. Conn. 2005), aff'd in pertinent part on reconsideration, 409 F. Supp. 2d 112 (D. Conn. 2006); see also R. Langer et al., 12 Connecticut Practice Series: Connecticut Unfair Trade Practices, § 3:7, Conduct Outside of Connecticut (collecting cases following this approach).

At this stage, without undertaking a fact-intensive analysis, the court finds that alleged violations are "tied to a form of trade or commerce intimately associated with Connecticut." See id. Here, the purchasing party is headquartered in Connecticut and is transacting for the delivery of goods to take place in Connecticut. In the court's view, that is sufficient to show enough of a nexus between the alleged unfair acts and Connecticut for CUTPA to apply.[6] However, the application of these principles is ultimately a "fact-intensive inquiry", see Bristol–Myers Squibb, 655 F. App'x 9, at 13, so the court makes this finding for the purposes of the present motion only. The defendant is not foreclosed from raising arguments about CUTPA's territorial scope at a later stage and on a developed record.

Accordingly, the court will apply Connecticut law for the purposes of the present

---

[6] Because one of the prongs in Victor G. Reiling is satisfied, the court does not need to decide the second prong, whether "choice of law principles . . . dictate application of Connecticut law." Victor G. Reiling, 406 F. Supp. 2d 175 at 200.

Motion, but the parties are not prejudiced from raising conflict-of-law arguments or arguments about the territorial scope of CUTPA at a later stage.

      B.    <u>Termination of Implied-in-Fact Distribution Agreement</u>

Count One of the Amended Complaint alleges that UNI and Leprino formed an "implied-in-fact distribution agreement" that Leprino breached when it terminated its relationship with UNI.  <u>See</u> Am. Compl. at ¶¶ 22-26.  In its opposition, UNI states that this claim is, "in substance", a claim that Leprino provided insufficient notice of termination under section 22-309(3) of the U.C.C.  Pl.'s Opp at n. 3.  The Connecticut U.C.C. states that "termination of a contract except on the happening of an agreed event requires that reasonable notification be received by the other party . . . ."  Conn. Gen. Stat. § 42a-2-309(3).

Leprino argues that Count One should be dismissed because the purchase orders and pro-forma invoices are express contracts, which forecloses the possibility of an implied agreement.  Def.'s Mem. at 12-13.  In the alternative, Leprino argues that the enforcement of such an implied agreement would be barred by the U.C.C. Statute of Frauds, Conn. Gen. Stat. § 42a-2-201.  <u>Id.</u> at 14.  UNI argues that the purchase orders and pro forma invoices can coexist with the alleged "implied-in-fact distribution agreement", and that their claim is not barred by the Statute of Frauds.  Pl.'s Opp. at 12-13.

Under Connecticut law, an implied-in-fact contract is "the same as an express contract, except that assent is not expressed in words, but is implied from the conduct of the parties."  <u>Vertex, Inc. v. City of Waterbury</u>, 278 Conn. 557, 574 (2006).  Likewise, the Connecticut U.C.C. states that "a contract for sale of goods may be made in any

manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract."  Conn. Gen .Stat. § 42a-2-204.

In support of their Motion, Leprino cites the common-law rule that an implied-in-fact contract "can only exist . . . where there is no express one."  Janusauskas v. Fichman, 264 Conn. 796, 804 (2003).  UNI responds that the two can coexist, because the common-law rule "is inapplicable where . . . an express contract covers one set of obligations and an implied contract covers another set of obligations."  Shelton Yacht & Cabana Club, Inc. v. Suto, 150 Conn. 251, 260 (Conn. 1963).

At the motion to dismiss stage, the court is unable to conclude that the exchange of express purchase orders and invoices encompasses the entire contractual relationship between two merchant parties.  See Conn. Gen. Stat. § 42-2-106 (defining "contract" as "the total legal obligation that results from the parties' agreement . . . ").  It is true that purchase orders, on their own, can form enforceable contracts upon acceptance.  See Fashion Leaf Garment Co. v. Essentials New York Apparel, LLC, No. 19-CV-03381 (ALC) (BCM), 2024 WL 1348655, at *3 (S.D.N.Y. Mar. 29, 2024) (New York U.C.C.) ("purchase orders containing the material terms of the transactions are enforceable agreements"), see Anhui Konka Green Lighting Co. v. Green Logic LED Elec. Supply, Inc., 625 F. Supp. 3d 269, 280–81 (S.D.N.Y. 2022) (concluding on summary judgment that "the parties entered into enforceable agreements . . . that were documented in the purchase orders, which set forth the material terms of the transactions.")  However, purchase orders and invoices can also represent individual transactions pursuant to a master contract, such as a distribution contract or supply agreement.  See Medinol Ltd. v. Bos. Sci. Corp., 346 F. Supp. 2d 575, 584 (S.D.N.Y.

2004) (a party submitted "regular purchase order forms" pursuant to a "supply agreement").

Because purchase orders can coexist with and even help facilitate obligations under these master contracts, the court cannot conclude at this stage that the alleged express documents preclude the existence of a master agreement, express or implied. Drawing all inferences in favor of UNI, the allegation that the parties exchanged purchase orders and invoices does not contradict the allegation that the parties had an ongoing supply agreement.  However, for the court to enforce such an agreement, it must satisfy the U.C.C. Statute of Frauds.

The U.C.C. Statute of Frauds provides that "the sale of goods for the price of five hundred dollars or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought. . . ."  Conn. Gen. Stat. § 42a-2-201.  There is no dispute that the value of UNI's Q4 orders would have exceeded $500.  Additionally, courts in this District have held that the U.C.C. Statute of Frauds applies to ongoing supply contracts where the total "value of the goods" exceeds the $500 threshold limit.  See Omega Eng'g, Inc. v. Eastman Kodak Co., 908 F. Supp. 1084, 1090 (D. Conn. 1995).

The U.C.C. Statute of Frauds also contains certain exceptions by which an unsigned contract may nevertheless be enforceable.  For example, the "merchant exception" contained in Section 2-201(2) provides:

> "Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) against such party unless written notice of objection to its

contents is given within ten days after it is received."

Conn. Gen. Stat. § 42a-2-201(2).  "There are no rigid requirements as to the form or content of a confirmatory writing."  Antifun Ltd. T/A Premium Vape v. Wayne Indus. LLC, 616 F. Supp. 3d 291, 307-08 (S.D.N.Y. 2022) (quoting Hilord Chem. Corp. v. Ricoh Elecs., Inc., 875 F.2d 32, 37 (2d Cir. 1989)) (New York U.C.C.).  Indeed, "[a] writing is sufficient so long as it affords a basis for believing that it reflects a real transaction between the parties."  Id.  Additionally, a contract which does not satisfy the U.C.C. Statue of Frauds may nonetheless be enforced "if the party against whom enforcement is sought admits in . . . testimony or otherwise in court that a contract for sale was made . . . ." Conn. Gen. Stat. § 42a-2-201(3).

Due to the breadth of these exceptions, the court declines to reach the Statute of Frauds issue at the motion to dismiss stage.  Although the Amended Complaint states that the agreement is "implied-in-fact", see Am. Compl. at ¶ 11, the court nonetheless cannot assume, prior to the completion of discovery, that no confirmatory writings or testimony exists which could satisfy an exception under the U.C.C.  See Niedernhofer v. Wittels, No. 17-CV-4451 (NSR), 2018 WL 3650137, at *4 (S.D.N.Y. July 31, 2018) ("because the Court cannot infer the absence of a written agreement from the face of the Complaint . . . [the] motion to dismiss . . . is denied at this time.").

Because the court cannot infer that the parties' express contracting documents preclude the existence of an ongoing supply agreement, and because the court declines to reach the Statue of Frauds issue at this stage, the Motion to Dismiss with respect to Count One is denied.

C.    "Roll Over" Delivery Breaches

Counts Two and Three deal with Leprino's alleged failure to allow UNI to "roll over" delivery of its orders in Q1 and Q3 of 2021, respectively.  Leprino argues that the parties' express contracts did not allow "roll over" deliveries, so they are not in breach of any contract terms.  Def.'s Mem. at 16-17.  UNI counters that the parties' course of dealing and usage of trade were incorporated into the parties' understanding of express contract terms, which, taken together, would have required Leprino to allow "roll overs." Pl.'s Opp at 19-24.

Under the Connecticut codification of the U.C.C. parol evidence rule, contract terms "may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented [ ] by . . . course of dealing or usage of trade [evidence] . . . (emphasis added)."  Conn. Gen. Stat. § 42a-2-202.  The Connecticut U.C.C. further provides that "the express terms of an agreement and any applicable . . . course of dealing or usage of trade must be construed whenever reasonable as consistent with each other."  Conn. Gen. Stat. § 42a-1-303(e).  However, if there is no reasonable way to construe express terms together with a course of dealing, then the express terms prevail.  Conn. Gen. Stat. § 42a-1-303(e)(1).

Leprino argues that, because the terms of UNI's purchase orders require deliveries on particular dates, they are irreconcilable with the practice of "roll overs," and therefore the express delivery dates must govern.  See Def.'s Mem. at 17-18.  UNI argues that the express contract terms can be reasonably construed consistently with a course of dealing involving "roll overs."  See Def.'s Mem. at 17-18, Pl.'s Opp at 19-24.

For the purposes of the present Motion, in the court's view, UNI has the better argument.

UNI's purchase orders, which are incorporated by reference[7] in the Amended Complaint, each contain a precise delivery date and hourly window, articulated as "Deliver on [date] ; [hour-hour]".  <u>See generally,</u> Ex. A to Mot. to Dismiss ("Purchase Orders") (Doc. No. 70-3).  Additionally, the Purchase Orders include clauses that state: "please notify us immediately if you are unable to ship as specified," and "any cross outs, added written text, or changes to this [Purchase Order] by vendor after purchaser has signed are not valid and not accepted." <u>See, for example</u>, Purchase Orders at 3.

Each responsive pro forma invoice from Leprino, all of which are also incorporated by reference in the Amended Complaint, has a date that corresponds to the purchase order's delivery date, but is instead labelled "ship date."  <u>See, for example</u>, <u>id. at 11.</u>  Drawing inferences in favor of UNI, it is the court's view that the discrepancy between a "delivery" date and a "ship" date is just enough to suggest that the party's understanding of the delivery date in the purchase orders was not exact.  At the motion to dismiss stage, the court must also credit the Amended Complaint's allegation that the date on the purchase orders was a "projected delivery date."  Am. Compl. at ¶ 11.  See "Projection." Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/projection. Accessed Jul. 2024. (definition 8, defining "projection" or "projected" as an "<u>estimate</u> of future possibilities based on a current trend (emphasis added).")

---

[7] A document is incorporated by reference if a complaint makes a "clear, definite, and substantial reference to the document." <u>Houghtaling v. Downes</u>, 623 F. Supp. 3d 145, 158 (W.D.N.Y. 2022).  Here, given UNI's clear and definite references to the purchase orders, as well as their reliance on the terms and effects of these purchase orders, the court deems them incorporated by reference to the Amended Complaint and will consider them for the instant motion.

In the court's view, there is just enough ambiguity in the alleged contract terms to plausibly allege that the written contracts permitted "roll overs" such that the parties understood, by course of dealing or usage of trade, that UNI was entitled to request a roll over.  See Conn. Gen. Stat. § 42a-1-303 ("the express terms of an agreement and any applicable . . . course of dealing or usage of trade must be construed whenever reasonable as consistent with each other.").  Thus, the court finds that UNI has barely, plausibly alleged that the parties mutually understood their agreements to allow roll-overs and require Leprino to consider them in good-faith, and that Leprino breached that obligation.

Because UNI has plausibly alleged breaches of contract related to its 2021 Q1 and Q3 rollovers, Leprino's Motion to Dismiss with respect to Counts Two and Three is denied.

D.      Implied Covenant of Good Faith and Fair Dealing

Leprino argues that UNI's Count Four claim, a breach of the implied covenant of good faith and fair dealing, must be dismissed because Leprino fulfilled the terms of its express contracts with UNI, and because those contracts did not include any discretionary terms.  Def.s Mem. at 20-22.  UNI responds that Leprino has breached its obligations and that its Amended Complaint alleges discretionary terms. Pl.'s Opp. at 26-30.

"[I]t is axiomatic that the . . . duty of good faith and fair dealing is a covenant implied into a contract or a contractual relationship. . . . In other words, every contract carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement."  M&T Bank v. Lewis, 349 Conn. 9,

34 (2024).  "The covenant of good faith and fair dealing presupposes that the terms and purpose of the contract are agreed [on] by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term. . ." <u>Renaissance Mgmt. Co. v. Connecticut Hous. Fin. Auth.</u>, 281 Conn. 227, 240 (2007).  "To constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith." <u>De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.</u>, 269 Conn. 424, 433 (2004).  "Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive . . . . Bad faith means more than mere negligence; it involves a dishonest purpose (citations and internal quotation marks omitted.)."  <u>Habetz v. Condon</u>, 224 Conn. 231, 237 (1992), citing Black's Law Dictionary (5th Ed.1979), and <u>Hartford Nat. Bank & Tr. Co. v. Credenza</u>, 119 Conn. 368, 177 A. 132, 133 (Conn. 1935).

The court has already held that UNI plausibly alleged that Leprino breached contract obligations.  The Amended Complaint likewise sufficiently alleges that Leprino "imped[ed] the plaintiff's right to receive benefits" that it expected under the contract. <u>De La Concha,</u> 269 Conn. 424 at 433.  The court also finds that UNI's allegations that Leprino acted to appease a disgruntled supplier, <u>see</u> Am. Compl. ¶ 49, and that a Leprino representative mislead UNI about whether it would provide a fourth-quarter offer and pricing, <u>see</u> Am. Compl. ¶ 19, are sufficient to plausibly allege a "dishonest

purpose" amounting to bad faith. <u>Habetz v. Condon</u>, 224 Conn. 231 at 237.

Finally, the court is not persuaded by Leprino's argument that Count Four is not based on discretionary contract terms.  <u>See</u> Def.'s Mem. at 21.  If the court accepts as true the allegation that delivery dates were projections and that UNI could request roll overs, then there would be good-faith discretion to decide the timing of a delivery.

Because UNI's plausibly alleges that Leprino, acting in bad faith, deprived it of benefits it could reasonably expect under its contracts, the Motion to Dismiss with respect to Count Four is denied.

    E.    <u>CUTPA</u>

Finally, UNI alleges that Leprino violated CUTPA through the following acts: (1) terminating without reasonable notice its implied-in-fact distribution agreement, (2) acting on communications from a disgruntled supplier ultimately leading to denying UNI the "roll overs" in Q1 and Q3, (3) failing to allow "roll overs" and cancelling deliveries of Q3 products UNI would not accept by the end of September 2021, (4) failing to provide UNI with the option of incurring a charge for the roll over of Q1 or Q3 products, (5) failing to provide UNI with its Quarter 4 pricing, and (6) failing to engage in good-faith negotiations with UNI for its requested rollovers.  Am. Compl. ¶ 53.

Leprino argues that UNI's CUTPA claims must be dismissed because they are based on alleged breaches of contract that lack the necessary "aggravating circumstances" to rise to a CUPTA violation.  Def.'s Mem. at 24-27.  UNI counters that their Amended Complaint alleges "significant aggravating circumstances" that can sustain a CUTPA claim.  Pl.'s Opp. at 30-33.

CUTPA provides "[n]o person shall engage in unfair methods of competition and

unfair or deceptive acts or practices in the conduct of any trade or commerce."  Conn. Gen. Stat.. § 42-110b.  The Connecticut Supreme Court has adopted the so-called "cigarette rule" developed by the Federal Trade Commission in the context of section 5(a)(1) of the Federal Trade Commission Act. According to the cigarette rule, a court must consider:

> "[W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some [common-law], statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [competitors or other businesspersons] . . . . All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three."

Cenatiempo v. Bank of Am., N.A., 333 Conn. 769, 790 (2019).

However, courts in Connecticut as well as in this Circuit have held that "a simple contract breach is not sufficient to establish a violation of CUPTA, particularly where the count alleging CUTPA simply incorporates by reference the breach of contract claim and does not set forth how or in what respect the defendant's activities are either immoral, unethical, unscrupulous or offensive to public policy."  Boulevard Assocs. v. Sovereign Hotels, Inc., 72 F.3d 1029, 1039 (2d Cir. 1995) (collecting Connecticut cases).  The Connecticut Supreme Court has held that a "simple breach of contract" must have "unethical behavior or other aggravating factors" for it to rise to the level of a CUTPA violation.  Naples v. Keystone Bldg. & Dev. Corp., 295 Conn. 214, 227 (2010). Therefore, when a CUTPA violation is based on a breach of contract, the focus of courts has been "whether the defendant's breach of contract was merely negligent or

incompetent, in which case the CUTPA claim [is] barred, or whether the defendant's actions would support a finding of intentional, reckless, unethical or unscrupulous conduct, in which case the contractual breach will support a CUTPA claim under the second prong of the cigarette rule.  Ulbrich v. Groth, 310 Conn. 375, 410 (2013).

In the court's view, because UNI's CUTPA claims sound in breach of contract, and because they incorporate the same allegations used to state breach of contract claims, see Am. Compl. ¶ 51, UNI is required to also plausibly allege that the breach is accompanied by aggravating circumstances.  However, "it is well settled that whether a defendant's acts constitute . . . deceptive or unfair trade practices under CUTPA  . . is a question of fact for the trier. . ." Langan v. Johnson & Johnson Consumer Companies, Inc., 95 F. Supp. 3d 284, 288–89 (D. Conn. 2015).  Thus, the court is reluctant to find at this stage that that UNI's allegations do not rise to that level of "aggravating circumstances" as a matter of law.

At a minimum, the court finds that the allegation a Leprino representative mislead UNI to its detriment into believing it would receive a fourth quarter pricing and an offer, see Am. Compl. ¶ 19,  is sufficient to allege an "aggravating circumstance" at this stage. Drawing inferences in the plaintiff's favor, the allegation suggests that not only did Leprino breach its contracts, it mislead UNI to its detriment about the availability of roll overs and future business.  See Kent Literary Club of Wesleyan Univ. at Middletown v. Wesleyan Univ., 338 Conn. 189, 213, 257 A.3d 874, 889 (2021) (acting in "bad faith with respect to the contract" may constitute unfairness under CUTPA), see also Langer et. al. at § 4.3 (collecting cases where a "bad faith breach" or a breach involving "actual or constructive fraud, or a design to mislead . . ." amount to a CUTPA violation).

Accordingly, UNI has plausibly alleged that aggravating circumstances accompany a breach of contract and has therefore alleged unfair act under CUTPA.

Additionally, the court notes that the allegation a Leprino representative mislead UNI about whether it would receive fourth quarter pricing may be sufficient to meet the standard of a "deceptive" act under CUTPA.  See Milford Paintball, LLC v. Wampus Milford Assocs., LLC, 156 Conn. App. 750, n.5. (2015) (noting that the "cigarette rule' expressly fleshes out only the "unfair prong," while the "deceptive" has a "more obvious and more narrow meaning.").  However, considering the sufficiency of UNI's allegations under an "unfairness" standard, the court need not undertake a separate analysis at this stage.

Because UNI plausibly alleges that aggravating circumstances accompany Leprino's alleged breach, Leprino's Motion to Dismiss with respect to Count Five is denied.

## V.  CONCLUSION

For the reasons discussed above, the defendant's Motion to Dismiss (Doc. No. 70) denied.  Pursuant to this court's August 7, 2024 Order (Doc. No. 128), dispositive motions, including motions to preclude experts, are due 45 days from the date of this Ruling.

**SO ORDERED.**

Dated at New Haven, Connecticut 22nd day of August 2024.

_____/s/ Janet C. Hall_____
Janet C. Hall
United States District Judge

22