### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ULTIMATE NUTRITION, INC., | : | |
| Plaintiff, | : | CIVIL CASE NO. |
| | : | 3:23-CV-00677 (JCH) |
| | : | |
| v. | : | |
| | : | |
| LEPRINO FOODS COMPANY, | : | APRIL 16, 2025 |
| Defendant. | : | |

**RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. NO. 149), MOTION TO PRECLUDE (DOC. NO. 146), AND MOTION TO DISREGARD (DOC. NO. 161).**

## I.  INTRODUCTION

Plaintiff Ultimate Nutrition, Inc. ("UNI") brings this lawsuit against Leprino Foods Company ("Leprino") pursuant to this court's diversity jurisdiction.  See Amended Complaint ("Am. Compl.") (Doc. No. 63).  UNI's claims arise out of Leprino' s decision in 2021 to deny UNI's requests to "roll over" its product orders into subsequent quarters, to cancel UNI's pending orders, and to terminate its business with UNI.  See id.  UNI alleges that Leprino breached the parties' contracts, breached the implied covenant of good faith and fair dealing, and committed unfair trade practices.  See id.

Now before the court are the defendant's Motion for Summary Judgment, see Motion for Summary Judgment ("Def.'s Mot.") (Doc. No. 149), as well as two related motions: the defendant's Motion to Preclude the Expert Testimony of J. Allen Kosowksy ("Mot. to Preclude") (Doc. No. 146), and the plaintiff's Motion to Disregard the Response of Leprino Foods Company to Plaintiff's Additional Material Facts ("Mot. to Disregard") (Doc. No. 161).  Each of these Motions is opposed.  See Memorandum in Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Mem.") (Doc. No. 156); see

Memorandum in Opposition to Motion to Preclude (Doc. No. 150); see Response to

Motion to Disregard (Doc. No. 161).

For the reasons set forth below, the defendant's Motion for Summary Judgment

is granted, and the court enters judgment in favor of the defendant. The related motions

are denied as moot.

## II. BACKGROUND

A.    <u>Factual Background</u>[1]

Ultimate Nutrition, Inc. ("UNI") is a Connecticut-based nutrition supplement

company. See Defendant's Statement of Material Facts ("Def's 56(a)(1) Stmt.") ¶ 1

(Doc. No. 149-2); Plaintiff's Local Rule 56(a)(2) Statement of Material Facts ("Pl.'s

56(a)(2) Stmt.") ¶ 1 (Doc. No. 156-1); Am. Compl. at ¶ 1.  Leprino Foods Company

("Leprino") is a dairy company based in Colorado, that produces large amounts of

mozzarella cheese.  See Def.'s 56(a)(1) Stmt. at ¶ 5; Pl.'s 56(a)(2) Stmt. at ¶ 5; Am.

Compl. at ¶ 2.  As a byproduct of making cheese, Leprino produces and sells various

whey protein products.  See Def.'s 56(a)(1) Stmt. at ¶¶ 4-6; Pl.'s 56(a)(2) Stmt. at ¶¶ 4-

6.  Prior to 2021, UNI was a longtime purchaser of Leprino's whey products and claims

to have purchased $30 million worth of whey from Leprino over a 25-year period.  See

Def.'s 56(a)(1) Stmt. at ¶¶ 4-6; Pl.'s 56(a)(2) Stmt. at ¶¶ 4-6; Plaintiffs' Statement of

Additional Material Facts at ¶ 4.

UNI purchased whey products from Leprino on a quarterly basis, as well as

through "spot sales," or one-time purchases.  See Def.'s 56(a)(1) Stmt. at ¶ 27; Pl.'s

---

[1] The court draws primarily from the parties' Local Rule 56(a) statements and supporting exhibits in summarizing the material facts.  As it must, the court construes all disputed facts in the light most favorable to UNI, the non-moving party.  It also notes where the facts are disputed.

56(a)(2) Stmt. at ¶ 27.  Quarterly sales followed a standard procedure. First, well in advance of a particular quarter, UNI would often send Leprino a "preliminary forecast" of how much it was planning to buy in upcoming quarters.  See, e.g., Pl.'s Ex. 33 (UNI emailing a "forecast" for April-December).  Then, approximately a month before the end of a given quarter, Leprino would send a formal offer to UNI for the next quarter.  See Def.'s 56(a)(1) Stmt. at ¶ 14; Pl.'s 56(a)(2) Stmt. at ¶ 14.  The offer communicated the quantity, or "volume," of whey products available for UNI to purchase in the next quarter, as well as a quoted unit price for each product.  See Def.'s 56(a)(1) Stmt. at ¶ 27; Pl.'s 56(a)(2) Stmt. at ¶ 27; see, e.g. Def.'s Ex. 16 at 6.  The parties could then negotiate over quantity and price.  See Def.'s 56(a)(1) Stmt. at ¶ 12; Pl.'s 56(a)(2) Stmt. at ¶ 29.  If UNI decided to purchase some or all of the offered whey products from Leprino, it would submit one or more purchase orders to Leprino, each purchase order corresponding with one semi-truck load.  See Def.'s 56(a)(1) Stmt. at ¶ 29; Pl.'s 56(a)(2) Stmt. at ¶ 29.  UNI's purchase orders included the quantity and price of each order, as well as a specific delivery date in the following quarter.  See, e.g., Def.'s Ex. 4.  For each purchase order, Leprino would issue a corresponding pro forma invoice.  See Def.'s 56(a)(1) Stmt. at ¶ 33; Pl.'s 56(a)(2) Stmt. at ¶ 33.

UNI did not pay for its orders at the time purchase orders and invoices were exchanged.  Instead, Leprino required UNI to pay for products prior to shipment or pick-up, a practice known as "cash in advance."  See Def.'s 56(a)(1) Stmt. at ¶ 23; Pl.'s 56(a)(2) Stmt. at ¶ 23.  Thus, for quarterly orders, the parties would exchange purchase orders and invoices in the quarter proceeding when payment and delivery would take place.  In addition to quarterly orders, Leprino also allowed "spot" purchases of whey

products, which are one-time purchases of its excess supply in a given quarter.  See Def.'s 56(a)(1) Stmt. at ¶¶ 19-20; Pl.'s 56(a)(2) Stmt. at ¶¶ 19-20.  "Spot purchases," in contrast to quarterly orders, involve a delivery date close to the date on which the purchase order is issued.  See Def.'s 56(a)(1) Stmt. at ¶ 22; Pl.'s 56(a)(2) Stmt. at ¶ 22.

Leprino was not UNI's exclusive supplier of whey products.  In an affidavit, Brenten Terrance Nauslar ("Mr. Nauslar"), Vice President of Business Development and Marketing at Leprino, testified that, as a quarterly customer of Leprino, UNI was free to purchase "all, some, or none of the product offered" in a given quarter, and that UNI was "under no obligation to purchase from Leprino in any given quarter."  Def.'s Ex. 2, Affidavit of Brenten Terrance Nauslar ("Nauslar Aff.") at ¶ 6.  In contrast to its quarterly customers like UNI, Leprino entered into written supply agreements with some of its customers that obligated those customers to purchase, and Leprino to supply, certain amounts of whey products over a designated period of a year or more.[2]  See Nauslar Aff. At ¶ 4, See Def.'s 56(a)(1) Stmt. at ¶ 22; Pl.'s 56(a)(2) Stmt. at ¶ 22.  UNI and Leprino did not entered into a written supply agreement.[3]  Despite the absence of a

---

[2] In its Statement of Material Facts, UNI denies Leprino's assertion that it has entered into written supply agreements with some of its customers.  However, UNI offers no evidence to dispute or contradict Mr. Nauslar's testimony.  UNI cites the affidavit of Melissa Rubino, but her testimony does not dispute that some of Leprino's customers entered into written supply agreements.  See Pl.'s Ex. 1 at ¶ 14 ("UNI understood that most of Leprino's whey customers had a quarterly supply agreement" (emphasis added)).

[3] Based on the testimony of Mr. Nauslar, Leprino asserts that UNI and Leprino have never entered into a supply agreement.  Def.'s 56(a)(1) Stmt. at ¶ 26.  UNI denies this statement based on the testimony of Ms. Rubino, who claims that "UNI purchased [whey products] from Leprino as a quarterly supply agreement customer."  Pl.'s 56(a)(2) Stmt. at ¶ 26; Pl.'s Ex. 1 at ¶ 10.  UNI cites no other evidence of a written agreement.  After a thorough review of the record before the court, the court concludes that neither party has come forward with a written supply agreement between UNI and Leprino.  Further, in their Memorandum in Support of the Motion, UNI refers to this purported agreement as an "implied in fact quarterly supply agreement."  See Memorandum in Opposition to Defendants Motion for Summary Judgment ("Pl.'s Mem.") (Doc. No. 156) at 1 (emphasis added).  Therefore, while the court recognizes that UNI contends an implied supply agreement exists, the court deems it admitted that the parties have never entered into a written supply agreement.

written agreement, Melissa Rubino, the UNI employee in charge of whey protein procurement at UNI, testified that Leprino was UNI's "preferred supplier," and that "UNI felt obligated to always purchase each quarter to stay in the door with [Leprino]."  Pl.'s Ex. 1, Affidavit of Melissa Rubino ("Rubino Aff.") at ¶¶ 9, 17.

For its quarterly sales, UNI's purchase orders included a specific date for delivery to take place in the following quarter.  See, e.g., Def.'s Ex. 4.  However, at times during the parties' business relationship, UNI requested, and Leprino agreed, to delay the delivery until the following quarter.  See Def.'s 56(a)(1) Stmt. at ¶ 56; Pl.'s 56(a)(2) Stmt. at ¶ 56.  This practice is known in the industry as a "roll over."  See id.  When Leprino agreed to "roll over" an order, the price listed on the purchase order did not change.  Thus, even if a Q2 order was "rolled over" for delivery in Q3, for example, UNI would still pay the Q2 price prior to taking delivery.  Leprino evaluated requests for a "roll over" on a case by case basis.  See Def.'s 56(a)(1) Stmt. at ¶ 57; Pl.'s 56(a)(2) Stmt. at ¶ 57.[4]

The parties dispute how roll-overs were viewed by Leprino.  In his affidavit, Mr. Nauslar testified that Leprino "disfavors rollovers."  Nauslar Aff. at ¶11.  Marlena Zimmerman, Leprino's Senior Sales Manager who oversaw sales to UNI, testified at her deposition that "[Leprino's] standard practice of business was to not have rollovers because that has a trickle effect of problems," though she admitted that "rollovers became common" with UNI.  Pl.'s Ex. 6 ("Zimmerman Dep.") at 68:1-7.  However, Melissa Rubino, the person in charge of procurement for UNI, testified that roll-overs "were common," and that "UNI and Leprino would discuss rollover requests in good faith

---

[4] The court deems this fact admitted because UNI's response does not dispute that Leprino reviews each request.  Neither the statement that "roll-overs were common," nor the statement that it would "blindly just continually roll it," dispute the assertion that each "roll over" request had to be reviewed and approved by Leprino.  Pl.'s 56(a)(2) Stmt. at ¶ 57.

and work cooperatively to shift dates as needed." Pl.'s Ex. 1 at ¶ 21. Leprino does not dispute that, on a number of occasions, Leprino has granted UNI's requests for a "roll over." See Zimmerman Dep. at 68:1-7. However, according to records attached to Ms. Rubino's affidavit, there had not been a single "roll-over" between Leprino and UNI in 2018, 2019, or 2020.[5] See Ex. A to Pl.'s Ex. 1.

In 2021, the parties' relationship began to sour over UNI's requests for roll-overs. In the first three quarters of 2021, market conditions, including the COVID-19 pandemic, caused the price of whey protein to rise by more than 150 percent. See Pl.'s Ex. 29 at 2. As a result, Leprino quoted higher prices each quarter for its whey products. See id.

In December 2020, Leprino sent UNI an offer for Q1 of 2021. See Def.'s 56(a)(1) Stmt. at ¶ 71; Pl.'s 56(a)(2) Stmt. at ¶ 71. UNI issued ten separate purchase orders for Q1 of 2021, corresponding to 10 loads for delivery. See id. At the quoted price, UNI would have paid approximately $1.3 million for these ten loads. See id. However, in March of 2021, towards the end of Q1, UNI requested that nine of these loads be rolled over not just one quarter, but two quarters, for delivery in Q3. See Def.'s 56(a)(1) Stmt. at ¶ 76; Pl.'s 56(a)(2) Stmt. at ¶ 76. Leprino denied the request and, instead of rolling them over, cancelled the nine orders, for which UNI had not yet paid. See Def.'s 56(a)(1) Stmt. at ¶ 79; Pl.'s 56(a)(2) Stmt. at ¶ 79.

Meanwhile, during Q1, UNI had sent twelve purchase orders for 12 loads to be delivered in Q2. See Def.'s 56(a)(1) Stmt. at ¶ 83; Pl.'s 56(a)(2) Stmt. at ¶ 83. By June

---

[5] Leprino disputes the accuracy of some of the information in this chart. See Reply to Plaintiff Ultimate Nutrition Inc.'s Memorandum in Opposition to Defendant Leprino Foods Company's Motion for Summary Judgment ("Def.'s Reply") (Doc. No. 159) at 9-10. However, this chart, which Ms. Rubino testified she created to represent past "roll overs," does not include a single roll-over in 2018, 2019, and 2020, and Leprino does not contest the fact that there was no such roll over in those years. Accordingly, the court deems that fact admitted.

of 2021, the last month of Q2, it had not yet paid for or accepted delivery of ten of these orders.  See Def.'s 56(a)(1) Stmt. at ¶ 84; Pl.'s 56(a)(2) Stmt. at ¶ 84.  UNI requested, and Leprino denied, that these orders be rolled over for delivery into Q3.  See Def.'s 56(a)(1) Stmt. at ¶ 85; Pl.'s 56(a)(2) Stmt. at ¶ 85.

Meanwhile, in Q2, UNI had issued ten purchase orders for delivery in Q3.  See Def.'s 56(a)(1) Stmt. at ¶ 86; Pl.'s 56(a)(2) Stmt. at ¶ 86.  The total value of these orders – due prior to delivery – was approximately $2.1 million.  See id.  Prior to accepting delivery of all of these orders, UNI asked Leprino for their Q4 offer.  Ms. Rubino testifies in her affidavit that, on a September 2 call with Ms. Zimmerman, Ms. Zimmerman promised to provide a Q4 offer regardless of how much of its Q3 loads UNI accepted that quarter.  Rubino Aff. at ¶¶ 54-55.  On September 7, Ms. Rubino emailed Ms. Zimmerman to again ask for the Q4 offer, so they could "lock up a contract."  Ex. K to Rubino Aff. ¶ 57.

By September 9, 2021, twenty-one days prior to the close of Q3, UNI had not yet paid for or taken delivery of six of its Q3 orders.  See Def.'s 56(a)(1) Stmt. at ¶ 87; Pl.'s 56(a)(2) Stmt. at ¶ 87.  At that point, Ms. Zimmerman contacted Ms. Rubino.  See Def.'s 56(a)(1) Stmt. at ¶ 88; Pl.'s 56(a)(2) Stmt. at ¶ 88.  Ms. Zimmerman asked Ms. Rubino how many of the six loads that UNI had ordered for Q3 would it take in Q3.  See id.  Ms. Rubino responded that she needed "to see [Leprino's] Q4 offer please to answer that question," adding that "depending what the offer is for Q4 regarding both price and volume . . . may affect what we pull this month from the Q3 contract."  Def.'s Ex. 37.  Ms. Zimmerman responded to Ms. Rubino that her response was "concerning" and asked for a phone call.  Id.  Later, on September 14, Ms. Rubino wrote to Ms.

Zimmerman: "I'd like to receive your Q4 pricing please and volume, as it will help us determine what we will be able to take for the remainder of this month.  I've been asking this for a few weeks, and am getting concerned that I haven't gotten your offer yet."  Id.  The same day, Ms. Zimmerman wrote back to Ms. Rubino and said, "I will not be proposing a price for Q4 and any volume that is not picked up by the end of [Q3] will not role [sic] over.  My team needs to know how much of your unconsumed forecast you will be ordering by the next weeks . . . . This was contracted volume for [UNI] but as I stressed previously, we cannot keeping [sic] rolling it for you and inventory can not [sic] sit."  Id.  The next day, on September 15, 2021, Ms. Zimmerman wrote again to Ms. Rubino saying, "I will need to know today how much of the remaining volume of [products] you will be ordering by the end of Q3.  A price proposal of the next quarter should never influence this decision on if [sic] you are going to honor your active [purchase orders] . . . or not."  Id.  After UNI failed to advise Leprino that day how much of the Q3 orders it would pay for and take,[6] see Pl.'s 56(a)(2) Stmt. at ¶ 96, Leprino cancelled UNI's remaining orders and terminated its business relationship with UNI.  See Def.'s 56(a)(1) Stmt. at ¶ 96; Pl.'s 56(a)(2) Stmt. at ¶ 96.

In her deposition, Ms. Zimmerman testified that she thought UNI was "playing a game, playing the markets" by "not indicat[ing] if they were going to be taking volume dependent on pricing of the next quarter."  Zimmerman Dep. at 209:8-12.  UNI denies that it was playing a pricing game and claims that Ms. Zimmerman's decision was a pretext to cancel orders and terminate the relationship without further notice.  See Pl.'s

---

[6] UNI's Statement of Material Facts does not dispute Leprino's assertion that Ms. Rubino failed to advise Ms. Zimmerman on that date of how much of its orders UNI would take that quarter.  See Pl.'s 56(a)(2) Stmt. at ¶ 96. Thus, the court deems that fact admitted.

56(a)(2) Stmt. at ¶ 94.

B.    Procedural Background

On April 18, 2023, UNI filed the present action in Connecticut Superior Court, Judicial District of Hartford.  See Complaint, ("Original Compl."), Attach. 1 to Notice of Removal ("Not. of Removal") (Doc. 1-1).  The Original Complaint alleged that the parties' course of dealing had created an "implied-in-fact distribution agreement."[7] Count One of its Complaint alleged that Leprino, by terminating its business relationship with UNI abruptly in Q3, breached this implied supply agreement and violated the "termination" provision of the Connecticut Uniform Commercial Code ("UCC"), Conn. Gen. Stat. § 42a-2-309(3), which requires "reasonable notification be received" in the event a party terminates a contract.  Original Compl. at Count One.  Count Two of the Complaint alleges that Leprino breached its contracts with UNI by not allowing "roll overs" of the purchase orders it executed in Q3.  Counts Three and Four, respectively, alleged breaches of the implied covenant of good faith and fair dealing and the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110a et. seq.

After being served with the Summons and Complaint, on May 24, 2023, Leprino removed the lawsuit to federal court.  See Not. of Removal (Doc. No. 1).  UNI later filed an Amended Complaint, with Leprino's consent, adding another Count alleging that Leprino breached its contracts with UNI by denying roll-overs and cancelling UNI's orders in Q1 of 2021.  See Am. Compl.

Thus, in its operative Complaint, Count One alleges breach of the implied-in-fact

---

[7] The court agrees with Leprino that the term "supply agreement" is more appropriate.  UNI does not act as a "distributor" of Leprino's products, because it is undisputed that UNI purchases whey products from Leprino primarily as raw materials for UNI's own products, not for wholesale or retail distribution.

supply agreement.  See id. at ¶¶ 22-26.  Counts Two and Three allege breach of contract related to the 2021 Q1 and Q3 purchase orders, respectively.  See id. at ¶¶ 27-45.  Counts Four and Five allege a breach of the implied covenant of good faith and fair dealing, and violations of the CUTPA, respectively.  See id. at ¶¶ 46-56.

On January 18, 2024, Leprino filed a Motion to Dismiss the Amended Complaint for failure to state a claim.  See Motion to Dismiss ("Mot. to Dismiss") (Doc. No. 70).  The court denied the Motion.  See Ruling on Motion to Dismiss ("Ruling") (Doc. No. 134) at 11-14.  The court did not reach the issue of whether an "implied-in-fact" contract existed, and declined to reach Leprino's statute of frauds defense in a pre-discovery Motion. See id.  Likewise, the court did not have the benefit of the parties "course of dealing" evidence and declined to dismiss the remaining Counts.  See id. at 15-22.

On October 21, 2024, Leprino filed its Motion for Summary Judgment.  See Def.'s Mot; see Defendant Leprino Foods Company's Memorandum of Law in Support of Motion for Summary Judgment ("Def.'s Mem.") (Doc. No. 149-1).  UNI filed a Memorandum in Opposition, and Leprino filed a Reply.  See Pl.'s Mem; see Reply to Plaintiff Ultimate Nutrition Inc.'s Memorandum in Opposition to Defendant Leprino Foods Company's Motion for Summary Judgment ("Def.'s Reply") (Doc. No. 159).

Also pending are two related motions: Leprino's Motion to Preclude the Expert Testimony of J. Allen Kosowsky (Doc. No. 146), and UNI's Motion to Disregard the Response of Leprino Foods Company to Plaintiff's Additional Material Facts (Doc. No. 161).  Both motions are opposed.  see Memorandum in Opposition to Motion to Preclude (Doc. No. 150); see Response to Motion to Disregard (Doc. No. 161).

### III. LEGAL STANDARD

A motion for summary judgment may be granted only when the moving party can establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Wright v. N.Y. State Dep't of Corr., 831 F.3d 64, 71-72 (2d Cir. 2016). If the moving party satisfies this burden, the nonmoving party must set forth specific facts demonstrating that there is indeed "a genuine issue for trial." Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). A genuine issue exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Cross Com. Media, Inc. v. Collective, Inc., 841 F.3d 155, 162 (2d Cir. 2016). Unsupported allegations do not create a material issue of fact and cannot overcome a properly supported motion for summary judgment. See Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000). In assessing the record to determine whether there are disputed issues of material fact, the trial court must "resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought." LaFond v. Gen. Physics Servs. Corp., 50 F.3d 165, 175 (2d Cir. 1995).

### IV. DISCUSSION

Leprino's Motion seeks summary judgment with respect to each of the Five Counts of the Amended Complaint. See Def.'s Mem. UNI opposes the Motion with respect to each Count.

A.    Count One: Termination of the Implied-in-Fact Distribution Agreement

Count One of the Amended Complaint alleges that Leprino, by cancelling orders and abruptly terminating its business relationship with UNI, breached an "implied-in-fact"

supply agreement that had been formed by the parties' course of dealing.  See Am.

Compl., Count One.  UNI has previous stated that, although the claim is styled as a

breach of an implied contract, it "is in substance a claim that seeks damages resulting

from Leprino's termination of its supply agreement with UNI without reasonable notice

as required by UCC § 2-309(3) . . . ."  Plaintiff's Memorandum in Opposition to Motion to

Dismiss (Doc. No. 89) at 5.  UCC §2-309(3) provides that "termination of a contract by

one party except on the happening of an agreed event requires that reasonable

notification be received by the other party. . . ."  Conn. Gen. Stat. § 42a-2-309.[8]  UNI

argues that Leprino, by declining to provide a Q4 offer and abruptly terminating their

business relationship, failed to provide reasonable notice of termination of their implied-

in-fact supply agreement, damaging UNI by forcing it to obtain replacement products at

higher prices.  See Am. Compl. at ¶ 24.

In its Motion for Summary Judgment, Leprino first argues that the undisputed

facts establish that its business relationship with UNI was quarter-to-quarter, and that no

"implied-in-fact" supply agreement or distribution agreement existed between UNI and

Leprino.  See Def.'s Mem. at 12-14.  Second, Leprino argues that, even if an implied

supply agreement existed, its enforcement would violate the UCC Statute of Frauds,

Conn. Gen. Stat. § 42a-2-201.  Def.'s Mem. at 14-15.

Because "the existence of an implied in fact contract is a question of fact,"

Connecticut Light & Power Co. v. Proctor, 324 Conn. 245, 258 (2016), the court elects

---

[8] As the court indicated in its past Ruling, the court is unaware of any differences between the
Colorado and Connecticut enactments of the UCC that would require a conflict-of-law determination in
this case.  See Ruling at 7-11.  Thus, the court will apply the Connecticut enactment of the UCC.  Where
the court refers generally to the "UCC," the reader should understand that it means the Connecticut UCC,
and the court will provide citations to the UCC as enacted in the Connecticut General Statutes, Conn.
Gen. Stat. § 42a-1-101 et seq.

to decide this issue on the second of Leprino's two grounds: the UCC Statute of Frauds. The court agrees with Leprino and holds that the alleged "implied in fact supply agreement" violates the UCC Statute of Frauds.  Because the Statue of Frauds renders the implied supply agreement unenforceable, the court also holds that UCC § 2-309(3) cannot be enforced under UNI's theory of implied contract.

Article II of the Connecticut UCC "applies to transactions in goods,"  Conn. Gen. Stat. § 42a-2-102, and the parties agree that the UCC applies to UNI's claims.  Under the common law of Connecticut, "an implied in fact contract is the same as an express contract, except that assent is not expressed in words, but is implied from the conduct of the parties."  Vertex, Inc. v. City of Waterbury, 278 Conn. 557, 573–74, (2006). Similarly, the UCC provides that a contract may be made "in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract."  Conn. Gen. Stat. § 42a-2-204(1).

The UCC Statute of Frauds provides that a contract for the sale of goods worth at least $500 is generally[9] not enforceable

> "unless there is some writing sufficient to indicate that a contract for sale
> has been made between the parties and signed by the party against
> whom enforcement is sought . . . .  A writing is not insufficient because it
> omits or incorrectly states a term agreed upon but the contract is not
> enforceable . . . beyond the quantity of goods shown in such writing."

Conn. Gen. Stat. § 42a-2-201(1).  In the court's view, the alleged implied agreement violates the Statue of Frauds for two independent reasons: the alleged agreement lacks a definite quantity term, and no signed writing exists confirming the existence of the agreement.  The court discusses both of these reasons below, before addressing UNI's

---

[9] The rule here is subject to a handful of exceptions, discussed infra at 18-23.

arguments that the agreement is exempted from the Statute of Frauds.  Finally, the court turns to UNI's argument that it can enforce the "reasonable notice" provision of the UCC even if the implied contract violates the UCC Statue of Frauds.

        1.      Whether the "Implied in Fact" Supply Agreement lacks a Quantity Term

The "implied in fact supply agreement" that UNI alleges lacks a definite quantity term, rendering the "agreement" unenforceable.  For a contract to be enforceable under the common law of Connecticut, there must be "definite agreement on the essential terms."  Willow Funding Co. v. Grencom Assocs., 63 Conn. App. 832, 845 (2001).  Under the Connecticut UCC, however, a contract can be formed "even though one or more terms are left open."  Conn. Gen. Stat. § 42a-2-204(3).  The UCC is more flexible regarding essential contract terms because, when terms are missing, "the UCC's gap filling provisions may supply the missing terms."  Alessi Equip., Inc. v. Am. Piledriving Equip., Inc., 578 F. Supp. 3d 467, 494 (S.D.N.Y. 2022) (New York UCC).  For example, under the UCC, parties can "conclude a contract for sale even though the price is not settled," because the court may supply "a reasonable price at the time for delivery."  Conn. Gen. Stat. § 42a-2-305(1).

However, the one required term under the UCC is the quantity of goods sold.  See Bazak Int'l Corp. v. Tarrant Apparel Grp., 378 F. Supp. 2d 377, 386 (S.D.N.Y. 2005) (New York UCC) ("quantity is the only contractual term specifically required under the UCC").  The UCC Statute of Frauds codifies this requirement by rendering a contract for sale not enforceable "beyond the quantity of goods shown . . . " Conn. Gen. Stat. § 42a-2-201(1).  The comment to this section explains that "material terms . . . need not be precisely stated . . . . [but] [t]he only term which must appear is the quantity term. . . ."

14

Id.;  see also Rosenfeld v. Basquiat, 78 F.3d 84, 93 (2d Cir. 1996) ("the only term that

must appear in writing is the quantity"); Coastal Aviation, Inc. v. Commander Aircraft

Co., 903 F. Supp. 591, 594 (S.D.N.Y. 1995) (the UCC "significantly relaxes the

requirement that the memorandum state all the essential terms by insisting only that it

state the quantity of goods") (quoting 2 E. Farnsworth on Contracts § 6.7).

      The UCC recognizes two exceptions to the rule requiring a written quantity term:

"output" and "requirements" contracts.  See Conn. Gen. Stat. § 42a-2-306.  These

contracts lack fixed quantity terms, but they instead "measure[ ] the quantity by the

output of the seller or the requirements of the buyer," respectively.  Id.  The UCC

recognizes these contracts even though they do not list a specific quantity, because

they provide a discernable methodology for determining the quantity of goods to be

sold:

> "The quantity term need only specify a mode or formula for calculation;
> once some quantity term is given, parol evidence may be admissible to
> show what the parties intended as to the exact quantity. Where, however,
> the agreement states no obligation to purchase any quantity, parol
> evidence cannot be used to supply the missing term in order to establish
> an enforceable requirements contract."

§ 4:20; Requirements contracts, 1 White, Summers, & Hillman, Uniform

Commercial Code § 4:20 (6th ed.)  In other words, the UCC recognizes

"requirements" and "output" contracts because, although they lack a set quantity,

they provide a formula which can be supplemented by parol evidence to

determine the quantity to be sold.

      In the present case, the "implied in fact supply agreement" lacks a quantity term

and has no discernable formula the court can use to determine quantity.  The implied

agreement UNI alleges does not require a certain quantity sold each quarter, or contain

a formula that ties quantity to some concept of "requirements" or "output."  Instead, what UNI seems to be asserting is that Leprino is bound to sell UNI <u>some indefinite quantity</u> of whey products in future quarters. Under this alleged implied agreement, Leprino's obligation was not to sell a fixed quantity and indeed, Leprino offered UNI different quantities each quarter.  <u>Compare</u> Def.'s Ex. 3 at 6 (Dec. 2020 offer letter to sell 250,000 lbs. of one whey product); Def.'s Ex. 33 at 5 (June 2021 offer letter to sell 165,080 lbs. of the same product).  Likewise, UNI was not obligated to purchase certain quantities and indeed, purchased different quantities in different quarters.  <u>See</u> Def.'s Ex. 30 at 1 (UNI requesting different volumes in two quarters of 2021).  In contrast to the implied agreement UNI is alleging, the written supply agreements that Leprino had with some of its other customers "require the customer to purchase, and Leprino to supply, <u>certain amounts</u> of whey protein products over a designated period. . . ." Nauslar Aff. at ¶ 4 (emphasis added).  Leprino's obligation to UNI under the alleged implied agreement has no similar fixed quantity term.

It is also clear that the alleged implied contract was not an "output" or "requirements" contract within the meaning of section 42a-2-306.  Leprino was not obligated to supply UNI's requirements and UNI was free to purchase part or all of its requirements from its other suppliers, which numbered at least four.  <u>See</u> Def.'s 56(a)(1) Stmt. at ¶¶ 61-62; Pl.'s 56(a)(2) Stmt. at ¶¶ 61-62.  And notwithstanding UNI's assertion that Leprino was its "preferred supplier," the record is clear that UNI was not obligated to buy any quantity of whey products from Leprino in a particular quarter.  For example, in one quarter of 2018, UNI elected not to purchase any of one particular whey product from Leprino.  <u>See</u> Def.'s 56(a)(1) Stmt. at ¶¶ 37-38; Pl.'s 56(a)(2) Stmt. at ¶¶ 37-38.

16

Thus, the quantity to be sold under the alleged implied agreement is not tied to any "requirements" formula, which would require UNI to obtain its quarterly requirements from Leprino, and require Leprino to supply them.

Instead, it is clear from the undisputed evidence that the quantity of sales was determined by quarterly negotiations over price and volume.  See Rubino Aff. at ¶ 19 ("once the quarterly negotiation over volume and price was concluded, UNI would submit purchase orders. . ."); see also Def.'s 56(a)(1) Stmt. at ¶¶ 13-14; Pl.'s 56(a)(2) Stmt. at ¶¶ 13-14.  These negotiations culminated with UNI submitting formal, quarterly purchase orders, supra at 3, which evidence an intent to be bound to buy a certain quantity and receiving from Leprino a confirmatory invoice that demonstrates an intent to be bound to sell that certain quantity in that quarter.  It was these quarterly negotiations, not any implied agreement, that fixed the quantity of sales between UNI and Leprino in a given quarter.  The undisputed fact that the quantity of sales was set by quarterly negotiations reinforces the court's conclusion that any alleged implied supply agreement lacked a quantity term, because the quantity, or "volume" of product contracted for was determined by contracting each quarter.  In the court's view, because the alleged implied agreement lacks a quantity term – or formula through which the court can determine a quantity – it is clearly too indefinite to be unforced under the UCC Statute of Frauds, Conn. Gen. Stat. § 42a-2-201(1).

The court also rejects UNI's argument that the exchange of demand forecasts in advance of a quarter helped form an implied supply agreement.  Forecasts of economic demand are, by definition, a prediction.  They do not indicate an intent to be bound to a certain quantity.  The undisputed fact that UNI and Leprino negotiated over price and

volume, after exchanging forecasts but before executing written contracts, clearly demonstrates that the parties did not consider themselves bound by their earlier forecasts.  Thus, these forecasts do not supply the missing quantity term.

Thus, the court concludes, in the absence of any material issues of fact and as a matter of law, that the implied in fact supply agreement that UNI alleges violates the UCC Statute of Frauds for lack of a quantity term.

### 2. Whether a Confirmatory Writing Exists Satisfying the Statue of Frauds

The UCC Statute of Frauds also requires a "writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought."  Conn. Gen. Stat. § 42a-2-201(1). Courts in this Circuit have held that this requirement does not only apply to one-time purchases: it also applies to ongoing agreements with an aggregate value over $500.  See Omega Eng'g, Inc. v. Eastman Kodak Co., 908 F. Supp. 1084, 1090 (D. Conn. 1995) ("[t]he alleged contract is subject to the [UCC] [S]tatute of [F]rauds because, had it been carried out, the value of goods sold would have exceeded $500").  There is no dispute here that the aggregate value of the alleged supply agreement exceeds $500.  See Def.'s Ex. 25 at 2-8 (seven UNI purchase orders, each valued at $130,454.12).  Further, UNI does not dispute that UNI and Leprino have never entered into a written supply agreement of the type Leprino has with some of its other customers.[10]  Thus, the court concludes with respect to the "implied in fact supply agreement" that there is no writing "sufficient to indicate that a contract for sale has been made."  Conn. Gen. Stat. § 42a-2-201(1).

That does not end the court's analysis, however.  In a rule frequently referred to

---

[10] See, fn. 3, supra.

as the "merchant exception," the UCC Statute of Frauds relaxes its writing requirements

when both parties are merchants:

> "Between merchants if within a reasonable time a writing in confirmation of
> the contract and sufficient against the sender is received and the party
> receiving it has reason to know its contents, it satisfies the requirements of
> [the UCC Statute of Frauds] against such party unless written notice of
> objection to its contents is given within ten days after it is received."

Conn. Gen .Stat. § 42a-201(2).  Thus, even though UNI and Leprino have not entered

into a written supply agreement, this exception to the Statute of Frauds would apply if

there were a "writing in confirmation of the contract" from Leprino.  Id.  "There are no

rigid requirements as to the form or content of a confirmatory writing.  A writing is

sufficient so long as it affords a basis for believing that it reflects a real transaction

between the parties."  Hilord Chem. Corp. v. Ricoh Elecs., Inc., 875 F.2d 32, 37 (2d Cir.

1989) (New York UCC).

Because of the UCC's liberal standard for what amounts to a "confirmatory

writing," the court has thoroughly reviewed the record looking for writings in which, even

informally, Leprino appears to confirm the existence of an ongoing supply agreement

with UNI.  Having reviewed all of the memoranda, email, invoices, orders, and other

writings in the record, the court does not see evidence of any "confirmatory writing," nor

has UNI cited to one.  Accordingly, the court concludes that the "merchant exception"

does not apply.

Further, an exception to the UCC Statute of Frauds also exists where "the party

against whom enforcement is sought admits in his pleading, testimony or otherwise in

court that a contract for sale was made."  Conn Gen. Stat. § 42a-2-201(3).  The court

has similarly reviewed all the testimony in the record and concludes that no Leprino

witness or employee has admitted in testimony that the parties have an ongoing supply agreement.

Thus, the court concludes in the absence of any material issue of fact, that the "implied in fact supply agreement" alleged by UNI violates the UCC Statute of Frauds, both for lack of a quantity term and for lack of a signed writing.

### 3.    Whether Any Other Exception Applies to the UCC Statute of Frauds

UNI offers two additional exceptions that it argues exempts the alleged implied in fact supply agreement from the UCC Statute of Frauds. First, UNI claims that the doctrine of equitable estoppel and part performance renders the agreement enforceable even without a signed writing. See UNI Mem. at 26-28. Relatedly, UNI argues that the implied supply agreement should be seen as an "indivisible good" which can be proven by part performance. See UNI Mem. at 30. The court rejects both arguments.

First, UNI argues that it can satisfy the exception created by the common-law doctrine of equitable estoppel and part performance. That doctrine, under Connecticut common law, bars a party from raising a Statue of Frauds defense when three elements apply:

> "[First], the party must do or say something that is intended or calculated to induce another to believe in the existence of certain facts and to act upon that belief, and [second,] the other, influenced thereby, must actually change his position or do some act to his injury which he otherwise would not have done. . . . [Third,] the party seeking to avoid the statute must demonstrate acts that constitute 'part performance' of the contract.

Glazer v. Dress Barn, Inc., 274 Conn. 33, 60 (2005) (internal citations and quotations omitted). At the outset, it is not clear to the court that this common-law doctrine applies

to disputes under the UCC.[11]  The court views this as unlikely, because the UCC has its

own part-performance exception, at Conn. Gen .Stat. § 42a-201(3)(1)(c).

The UCC rule provides that "[a] contract which does not satisfy the requirements

of [the UCC Statute of Frauds] . . . is enforceable . . . with respect to goods for which

payment has been made and accepted or which have been received and accepted."

Conn. Gen .Stat. § 42a-201(3).  It appears to the court that, in disputes under the UCC,

Connecticut courts apply the UCC "part performance" rule, not the common law rule.

See Omega Eng'g, Inc. 908 F. Supp. at 1091 (applying section 42a-201(3) to analyze

part performance arguments under the UCC Statute of Frauds); see Manheimer v.

Matzdorff, 1980 WL 98445 (Conn. Super. Ct. Feb. 15, 1980) ("partial payment satisfies

the [UCC] statute [of frauds] only as to that portion for which payment has been made

and accepted").  Thus, the court will apply the UCC "part performance" rule.

Applying the UCC rule, the partial performance exception to the Statute of

Frauds applies only "with respect to goods for which payment has been made and

accepted or which have been received and accepted."  Conn. Gen .Stat. § 42a-201(3).

Therefore, in order for a party to avail itself of the exception, the party must have

already either paid for the goods or received the goods.  In the present case, UNI

cannot claim this exception for an indefinite, future supply agreement because it does

not pay for future orders until immediately before delivery.  Under its theory of implied

contract, UNI is trying to enforce obligations for future orders for which it has not yet

paid for or accepted. Thus, it is not seeking to enforce obligations "with respect to goods

---

[11] Indeed, none of the cases that UNI cites in this section of its brief are UCC cases.  See, e.g. Esquire Radio & Elecs., Inc. v. Montgomery Ward & Co., 804 F.2d 787, 795 (2d Cir. 1986) ("the [UCC] Statute of Frauds would not apply here, since Ward's obligation was fundamentally not for the purchase of goods").

for which payment has been made and accepted" or with respect to goods "which have been received and accepted."  Conn. Gen .Stat. § 42a-201(3).  Thus, the UCC "part performance" exception does not bar the application of the UCC Statute of Frauds in this instance.  See Omega Eng'g, Inc., 908 F. Supp. at 1091, quoting Artman v. Int'l Harvester Co., 355 F. Supp. 482, 484 (W.D. Pa. 1973) ("Although affording buyers a remedy for goods accepted and paid for, section 2–201(3)(c) does not indicate in any way that a delivery of goods shall bind two parties to a complex on-going franchise relationship" (emphasis added)).

UNI's second argument to except itself from the Statute of Frauds is that its "implied in fact" supply agreement should be treated as an "indivisible" contract, the partial performance of which would exempt it from the Statue of Frauds.  See UNI Mem. at 30.  However, each of the cases it cites are distinguishable.  Certain of the cases cited by UNI are simply applying the UCC's part performance rule, discussed above. See Antifun Ltd. T/A Premium Vape v. Wayne Indus. LLC, 616 F. Supp. 3d 291, 308 (S.D.N.Y. 2022) ("partial performance is an exception to the writing requirement, provided that payment has been made and accepted").  The court has already rejected the argument that the UCC's partial payment exception applies.  Next, certain of these cases rely on exclusive dealing arrangements not present in this case to arrive at their conclusion that the contract is "indivisible."  See Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc., 63 F.3d 1267 (3d Cir. 1995).  In Stelwagon, the Third Circuit held that part performance of an "exclusive dealing agreement" rendered a contract indivisible, and thus excepted it from the Statute of Frauds.  However, the Court was clear that exclusivity was key to their holding and stated that, "[i]f the contract was divisible by

time or by shipments, [the defendant] would only have obligated itself to deal exclusively with [the plaintiff] so long as [the defendant] chose to do so. . . . Once [the defendant] granted [the plaintiff] an exclusive distributor contract, albeit orally, and acted on it, that agreement could only be enforced as a whole or not at all." Stelwagon, 63 F.3d at 1276-7.  Here, UNI had no exclusive arrangement with Leprino; UNI was free to seek whey products elsewhere in any given quarter, as it did.  See, supra, at 16.  Thus, the court does not see any grounds to conclude that the contract is "indivisible" in the way that allows for an exception to the Statute of Frauds.  If the court were to hold otherwise, almost any contract for sale could be construed as "part performance" of a larger future supply obligation, and thus exempted from the UCC Statute of Frauds.

Thus, the court concludes that the UCC Statute of Frauds bars enforcement of the alleged "implied in fact supply agreement" as a matter of law, and that UNI's claimed exceptions do not apply.

    4.    Whether UNI can Enforce the UCC "Reasonable Notice" Provision
          Notwithstanding the Statute of Frauds

Last, the court turns to UNI's argument that, even if the implied supply agreement violates the UCC Statute of Frauds, UNI can still maintain a standalone claim under the "reasonable notice" provision of the Connecticut UCC, Conn Gen. Stat. § 42a-2-309. That provision provides that "[t]ermination of a contract by one party except on the happening of an agreed event requires that reasonable notification be received by the other party."  Conn Gen. Stat. 42a-2-309(3).

In making this argument, UNI relies on Comment Four of the Official Comments to the UCC Statute of Frauds provision, which provides that "[f]ailure to satisfy the requirements of [the UCC Statute of Frauds] does not render the contract void for all

purposes, but merely prevents it from being judicially enforced in favor of a party to the contract." Conn. Gen. Stat. Ann. § 42a-2-201. UNI argues that its claim for wrongful termination without reasonable notice does not require "judicial enforcement" of the underlying implied contract, and it is therefore not barred by the Statue of Frauds. The court disagrees.

In support of its argument, UNI cites a number of cases where the requirements of UCC § 2-309(3) were read into oral or implied contracts, and enforced as part of those contracts. See Primarque Prod. Co. v. Williams W. & Witts Prod. Co., 988 F.3d 26 (1st Cir. 2021); see also Coburn Supply Co. v. Kohler Co., 342 F.3d 372 (5th Cir. 2003). The court does not dispute that the terms of UCC § 2-309 may be read into an implied or oral agreement. It is another matter entirely, however, to enforce those provisions when enforcement of the underlying agreement is barred by the UCC Statute of Frauds.

UNI does not cite any case, and the court is not aware of any, where a court has enforced the requirements of § 2-309(3) after holding that the underlying contract is unenforceable under the UCC Statute of Frauds. Nor do the examples provided in Comment 4 to the UCC Statute of Frauds suggest that UCC terms can be imputed to an unenforceable agreement.[12]

UNI's reliance on the First Circuit's decision in Primarque is misplaced, because the decision is distinguishable. First, the District Court in Primarque never found that

---

[12] In stating that the failure "to satisfy the requirements of this section does not render the contract void for all purposes," Comment 4 to the UCC Statue of Frauds gives the following examples: "For example, a buyer who takes possession of goods as provided in an oral contract which the seller has not meanwhile repudiated, is not a trespasser. Nor would the Statute of Frauds provisions of this section be a defense to a third person who wrongfully induces a party to refuse to perform an oral contract, even though the injured party cannot maintain an action for damages against the party so refusing to perform." Neither of these examples, in the court's view, supports the idea that the provisions of section 2-309(3) can be enforced against a party when the underlying contract violates the Statute of Frauds.

the implied agreement in that case violated the UCC Statute of Frauds, and no Statute of Frauds argument was raised on appeal. In the present case, the court has concluded that the implied agreement violates the UCC Statute of Frauds. Second, the "implied in fact" contract in Primarque was a distributorship agreement.[13] See Primarque, 988 F.3d at 37. Because the plaintiff was bound to act as a "distributor" of the defendants' products, the defendant had a reciprocal obligation to periodically supply the plaintiff with products to distribute. In the present case, UNI is not acting as a distributor of Leprino's products, because UNI purchases whey from Leprino for use in its own products. So UNI does not have a contractual duty to "distribute" Leprino's products in a way that would require Leprino to continue selling to UNI. See, supra at 15-16.

The provisions of section 2-309(3) (in Connecticut, section 42a-2-309(3)), require an underlying contract for sale to be enforceable in order for these provisions to be enforced. The terms of § 2-309(3) apply to "termination of a contract." Conn. Gen. Stat. § 42a-2-309(3)) (emphasis added); see also Tang v. Jinro Am., Inc., No. CV-03-6477CPS CLP, 2008 WL 4163183, at *3 (E.D.N.Y. Sept. 4, 2008) ("UCC § 2-309(3), by its terms, applies to 'termination of a contract." (emphasis added)). Thus, the text of the statute necessarily provides that enforcement of the UCC termination provisions necessarily requires enforcement of a contract.

The court's conclusion is further supported by the fact that section 2-309(3) is among those UCC provisions commonly referred to as "gap-fillers." See 1 White, Summers, & Hillman, Uniform Commercial Code § 4:9 (6th ed.) § 4:7. Duration and

---

[13] In Primarque, the jury's finding that an implied contract existed between the parties was supported by evidence that the parties had prior written distribution agreements. Primarque, 988 F.3d at 29. In the present case, the parties do not have a prior written supply agreement.

Notice of Termination (referring to the provision as a "gap-filler").  UCC "gap-fillers" exist to supply missing terms to an otherwise enforceable contract.  <u>Alessi Equip., Inc. v. Am. Piledriving Equip., Inc.</u>, 578 F. Supp. 3d 467, 494 (S.D.N.Y. 2022) ("under the UCC, the fact that one or more terms are left open is not fatal, because the UCC's gap filling provisions may supply the missing terms" (internal citations and quotations omitted)).  Thus, a UCC gap filling provision exists to supply a missing terms <u>to a contract</u>.  The enforcement of a gap filling provision, therefore, requires its enforcement as a contract term, not as part of a standalone claim.  Thus, if the underlying contract is unenforceable, the provision cannot be enforced.  Accordingly, the court rejects UNI's argument that it can enforce the "reasonable" notice provision of the UCC even if the underlying contract is unenforceable under the UCC Statute of Frauds.

Therefore, the court concludes that the alleged implied in fact supply agreement violates the UCC Statute of Frauds and is unenforceable as a matter of law.  As a result, the court cannot enforce the requirements of UCC § 2-309(3).  Accordingly, the court grants Leprino's Motion for Summary Judgment with respect to Count One.

B.    <u>Counts Two and Three: "Roll Over" Breaches</u>

Counts Two and Three of the Amended Complaint allege that Leprino breached its express contracts with UNI.  <u>See</u> Am. Compl. ¶¶ 27-45.  UNI alleges that Leprino breached these express contracts by refusing to allow "roll overs" of UNI's orders in quarters one and three, respectively.[14]  UNI is clear that it bases its claims on the

---

[14] The breaches alleged in Counts Two and Three of the Amended Complaint are that Leprino denied "roll overs" to UNI.  Somewhat confusingly, in its express contract claims, UNI does not allege that the cancellation of the Q3 orders breached the express contracting documents for Q3.  <u>See</u> Am. Compl. at ¶¶ 27-45.  Instead, the UNI's Complaint alleges that the cancellation was a violation of the implied agreement between the parties referenced in Count One.  <u>See id.</u> at ¶ 23. Accordingly, the court will not consider here whether that cancellation was a breach of express contracting documents.

parties' express contracts, not on a theory of implied contract.  See Pl.'s Mem. at 31 (referring to whether Leprino "breached the Express Contracts").

In its prior Ruling, the court found it troubling that the parties express contracts— the basis for Counts Two and Three – contained no references to "roll overs," and instead contained seemingly inflexible delivery dates.  See Ruling at 15-17.  However, because course of dealing evidence – then unseen by the court – could supplement the written terms of the contracts, the court denied the Motion to Dismiss these Counts. See id.

In its Motion for Summary Judgment, Leprino argues that UNI's course of dealing and trade usage evidence is insufficient to show that Leprino was obligated to grant a "roll over."  Def.'s Mem. at 18-24.  In its Opposition, UNI argues that its course of dealing evidence creates a genuine issue of material fact as to whether UNI is entitled to a "roll-over."  See Pl.'s Mem. at 30-34.  The court agrees with Leprino.

The elements of a breach of contract claim are (1) the formation of an agreement, (2) performance by one party, (3) breach of the agreement by the other party, (4) and damages.  Meyers v. Livingston, Adler, Pulda, Meiklejohn & Kelly, P.C., 311 Conn. 282, 291 (2014).  In interpreting a written contract, the UCC allows the admission of evidence of a "course of dealing."  See Con. Gen. Stat. § 42a-1-303.  A "course of dealing" is a "sequence of conduct concerning previous transactions between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." Conn. Gen. Stat. § 42a-1-303(2)(b).  The UCC provides that the "express terms of an agreement and any applicable . . . course of dealing . . . must be construed whenever

reasonable as consistent with each other."  Conn. Gen. Stat. § 42a-1-303(2)(b)(e).  If

such a construction is unreasonable, "express terms prevail over . . . course of dealing."

Conn. Gen. Stat. § 42a-1-303(2)(b)(e)(1).  Thus, course of dealing evidence can help

distinguish between competing interpretations of a contract.  See 1 White, Summers, &

Hillman, Uniform Commercial Code at § 2:31 (6th ed.) ("there are often multiple ways

one could read an 'express term' and course of performance or course of dealing may

show the right way to read the term").

Here, because Counts Two and Three are claims for breach of express contracts,

the court will begin by analyzing the parties' express contracts.  Each of UNI's purchase

orders lists a specific delivery date and time window in which delivery is to take place.

See, e.g. Def.'s Ex. 25 at 2 (purchase order dated December 8, 2020, for "[d]eliver[y] on

Jan. 12, 2021; 6am-2pm").  None of these documents mention or allude to roll overs, or

otherwise indicate that the delivery date is meant to be flexible.  For example, the

purchase orders could say "for delivery in Q2 or a subsequent quarter," but they contain

no such language.  Instead, the purchase orders have a specific delivery date, which is

emphasized to the reader in text that is bolded, underlined, in bright red font and, in

case the reader missed it, highlighted.  See, e.g., id.  On their face, based on the

emphasis these purchase orders place on specific delivery dates, the parties appeared

to expect tender to take place on those dates.

However, the "express terms of an agreement and any applicable . . . course of

dealing . . . must be construed whenever reasonable as consistent with each other."

Conn. Gen. Stat. § 42a-1-303(2)(b)(e).  UNI witnesses testified that the dates that

appear on the invoices are "projected" delivery dates.  See Def.'s Ex. 1, Deposition of

Brian Rubino at 56:21 (referring to "projected dates"); see Rubino Aff. at ¶ 19 ("purchase orders . . . contained a projected delivery date").  In the court's view, the present record also supports the view that these dates are mere projections.  After a through review of the record, the court is not aware of any instances where either party insisted that goods be tendered on those exact dates.  Further, there is no evidence before the court that Leprino treated UNI's lack of adherence to those specific dates as a breach.  Thus, in the court's view, the record establishes that, read together with the parties' course of dealing, these dates should be interpreted as projected delivery dates.

However, that is not to say that the express contracts place no limitations on when UNI must accept orders.  In her affidavit, Ms. Rubino, who managed procurement for UNI, testified that it was her understanding that, when Leprino did not grant a "roll over," she had until the "end of the quarter" to pick up product ordered for that quarter.  Rubino Aff. at ¶¶ 51, 60.  Further, the fact that UNI had to request a "roll over" when delivery would occur in subsequent quarters, indicates that in the absence of a "roll over," UNI was expected to take delivery in the same quarter listed on its purchase orders.  Thus, the express contracting documents, read together with Ms. Rubino's understanding and the parties' course of dealing, indicate that UNI had to take delivery of the products it ordered by the end of that quarter, unless UNI was granted a "roll over."

The key question for the court, then, is whether UNI's course of dealing evidence creates a genuine issue of material fact about whether UNI was entitled to a roll over into another quarter.  In the court's view, it does not.

In support of their opposition, UNI offers a four-page chart created by Ms. Rubino

that purports to list several dozen orders of whey products between 2010 and 2021, which Leprino allowed to cross quarters, i.e., it granted a "roll over."  See Ex. A to Pl.'s Ex. 1.[15]  UNI argues that these past instances create a "course of dealing," which entitled it to "roll overs" in 2021.  See UNI Mem. at 31.

What UNI's argument glosses over is that, in these instances, UNI asked for, and Leprino consented, to the "roll over."  Contrary to UNI's suggestion, this course of dealing evidence does not simply include UNI's requests.  It is as much a part of this evidence that Leprino reviewed these requests and gave its consent.  What UNI seems to be arguing is that, based on this course of dealing, it has a contract option it can unilaterally exercise, thereby binding Leprino to "roll over" the order.  However, in the court's view, no reasonable jury could make that finding based on UNI's course of dealing evidence.  Past instances where Leprino consented to a "roll over" do not provide a jury with a factual basis to conclude that UNI could obtain a "roll over" without Leprino's consent.

Crucially, UNI offers no course of dealing or other evidence that would allow a reasonable jury to find UNI was entitled to a "roll over" over Leprino's objection.  There is no genuine dispute that Leprino reviews "roll over" requests on a case by case basis.  See Def.'s 56(a)(1) Stmt. at ¶ 57; Pl.'s 56(a)(2) Stmt. at ¶ 57.[16]  Brian Rubino, the CEO of UNI, conceded in his deposition that UNI could not unilaterally elect to roll loads into another quarter.  See Def.'s Ex. 1 at 152:8-14.  Further, a careful review of emails between Ms. Rubino and Ms. Zimmerman reveals that UNI's communications

---

[15] In it's Reply, Leprino disputes whether some of these instances were actually "roll-overs." See, Def.'s Reply at 9-10.

[16] Although UNI's statement denies Leprino's assertion, the court has deemed this fact admitted. See supra at fn. 4.

requesting a "roll over" are more in the manner of asking for one, rather than enforcing a unilateral right or option under a contract.  <u>See</u>, <u>e.g.</u>, Ex. I to Pl.'s Ex. 1, ("<u>Can</u> we move these 9 loads to quarter 3? . . . if so, <u>please let me know</u> . . .") (emphasis added).  Thus, UNI's course of dealing evidence fails to create a material issue of fact over whether UNI was entitled to a "roll over" under the express contracts.

Because UNI and Leprino's pattern of dealing involves both UNI's requests and Leprino's consent to a "roll over", these "roll-overs" are better understood, as a matter of law, as contract modifications under the UCC, rather than contract options that can be unilaterally exercised.  The UCC recognizes the right of parties to modify the terms of their contracts and states that "[a]n agreement modifying a contract within this Article needs no consideration to be binding."  Conn. Gen. Stat. § 42a-2-209.  Thus, UNI and Leprino are free to modify their express contracts to "roll over" delivery dates without Leprino receiving further consideration.  However, the UCC definition of a "modification" is clear: it requires "agreement."  Conn. Gen. Stat. § 42a-2-209.  Without agreement, there is no modification.  Because UNI cannot unilaterally modify its contracts, there are no material facts upon which a reasonable jury could find that UNI had the power to grant itself a "roll-over" without Leprino's consent.

The court need not undertake a thorough and separate analysis of UNI's "usage of trade" evidence.  Under the Connecticut UCC, "course of dealing prevails over usage of trade."  Conn. Gen. Stat. 42a-1-303(2)(e)(3).  UNI's course of dealing evidence fails to genuinely dispute that Leprino must give consent to "roll overs.", and that evidence is given preference in interpreting the parties' express contracts over any usage of trade evidence to the contrary.  Ultimately, however, UNI's usage of trade evidence similarly

fails to create a material issue of fact.  In the present record, such evidence is largely focused on the likelihood that other companies besides Leprino would voluntarily allow "roll overs."  See e.g., Def.'s 56(a)(1) Stmt. at ¶ 64; Pl.'s 56(a)(2) Stmt. at ¶ 64 ("Glanbia Nutritionals expects its customers to take the product in the quarter that price was quoted").  Thus, this usage of trade evidence goes no further than UNI's course of dealing evidence towards creating a genuine issue of fact over whether UNI has a right to a "roll over" without Leprino's agreement.  Thus, in the court's view, both UNI's course of dealing and its usage of trade evidence fail to create a genuine factual dispute over whether "roll overs" require Leprino's consent.

Because UNI's course of dealing and usage of trade evidence fails to provide a basis on which a reasonable jury could find that UNI has a unilateral right to a "roll over," and because the parties' written contracts are silent on the issue, UNI has failed to create a genuine issue of fact as to whether it is entitled to a "roll over" under the express contracts.  Because a "roll over" is better understood as a modification of the parties written contracts, it requires Leprino's "agreement," which is lacking here.  Conn. Gen. Stat. § 42a-2-209.  Without a modification, the parties are bound to the terms of the original contract, whereby UNI agreed to acquire a certain quantity of whey products, for a certain price, within a specified quarter.  If it does not do so, UNI breaches its promise to accept the products within a particular quarter.  Under the UCC, one of the permissible remedies afforded to a seller in the event of a buyer's breach is cancellation.  See Conn. Gen. Stat. § 42a-2-703(f).  Thus, the court concludes, where it denied "roll overs" and cancelled orders, as a matter of law, Leprino was acting within its rights.

Thus, the court concludes that UNI's "course of dealing" evidence is insufficient to create a genuine issue of material fact.  When a "roll over" is understood as a contract modification, UNI cannot obtain one without Leprino's consent.  Because UNI did not have Leprino's consent in 2021 to "roll overs" of its Q1 and Q3 orders, it was not contractually entitled to them. Thus, Leprino's Motion for Summary Judgment is granted with respect to Counts Two and Three, which pertain to UNI's "roll over" requests in Q1 and Q3 of 2021, respectively.

C.    Count Four: The Implied Covenant of Good Faith and Fair Dealing

Count Four of the Amended Complaint alleges a breach of the implied covenant of good faith and fair dealing.  See Am. Compl. at ¶ 46-50.  In its Motion, Leprino argues that, because Count Four is based on the same facts as its claims for breach of contract, it cannot maintain the claim without a breach.  Def.'s Mem. at 24-25.  The court agrees.

The duty of good faith and fair dealing is a covenant implied into a contract or a contractual relationship. . . .  In other words, every contract carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement."  M&T Bank v. Lewis, 349 Conn. 9, 34 (2024), quoting Renaissance Mgmt. Co. v. Connecticut Hous. Fin. Auth., 281 Conn. 227, 240 (2007).  "To constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith."  Id.  Because a breach of the covenant requires that a defendant "impede the plaintiff's right to receive benefits . . . reasonably expected under the contract," the

covenant "is not implicated by conduct that does not impair contractual rights."

Capstone Bldg. Corp. v. Am. Motorists Ins. Co., 308 Conn. 760, 794-795 (2013).

Here, the court has granted summary judgment on UNI's breach of contract claims and held that Leprino has not breached its contracts with UNI. Thus, Leprino has not deprived UNI of "benefits that . . . [it] reasonably expected to receive under the contract." Id. Because Leprino has not breached its contracts with UNI, the court concludes that it has not breached the implied covenant of good faith and fair dealing. See Id. ("Unless the alleged failure . . . led to the denial of a contractually mandated benefit in this case, the plaintiffs have not raised a viable bad faith claim"); see also Valls v. Allstate Ins. Co., No. 3:16-CV-01310 (VAB), 2017 WL 4286301, at *5 (D. Conn. Sept. 27, 2017), ("[b]ecause Plaintiffs have not plead a plausible claim for breach of contract, their claim for breach of the implied covenant of good faith and fair dealing also fails.") aff'd, 919 F.3d 739 (2d Cir. 2019) ("because [the defendant] did not breach its contract, the [plaintiff's] bad faith . . . claim[] necessarily fail[s]"); Farmington Vill. Dental Assocs., LLC v. Cincinnati Ins. Co., 549 F. Supp. 3d 249, 263 (D. Conn. 2021), aff'd, No. 21-2080-CV, 2022 WL 2062280 (2d Cir. June 8, 2022) ("[b]ecause . . . [the plaintiff's] breach of contract claim fails, its breach of the covenant of good faith and fair dealing claim fails as well").

UNI's claim under the implied covenant of good faith and fair dealing is grounded in the same allegations as its breach of contracts claims, namely the cancellation of UNI's orders and termination of its business relationship with UNI, and the denial of "roll-overs" in 2021. See UNI Mem. at 34-37. As the court has already held, neither action by Leprino violated a contractual duty. The court has concluded that the "implied-in-

fact" agreement UNI alleges is unenforceable, and that "roll-overs" are effectively contract modifications to which Leprino is not obligated to consent. As a result, the court concludes as a matter of law that Leprino has not deprived UNI of "benefits that . . . [it] reasonably expected to receive under the contract." Capstone, 308 Conn. at 796.

Accordingly, Leprino's Motion for Summary Judgment is granted with respect to Count Four.

D.    Count Five: CUTPA

Count Five of the Amended Complaint is a claim under CUPTA. CUTPA provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat.. § 42-110b. In determining whether a given action is "unfair," Connecticut courts have adopted the "cigarette rule," which requires a court to consider:

> "(1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some [common-law], statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [competitors or other businesspersons]. . . . All three criteria do not need to be satisfied to support a finding of unfairness."

Cenatiempo v. Bank of Am., N.A., 333 Conn. 769, 790 (2019). However, where CUTPA violations are grounded in contractual relations, Connecticut law is clear that "not every contractual breach rises to the level of a CUTPA violation." Naples v. Keystone Bldg. & Dev. Corp., 295 Conn. 214, 228 (2010). Courts in Connecticut as well as this Circuit have held that a breach of contract on its own is insufficient to establish a violation of CUTPA without "aggravating circumstances":

> "[A] simple contract breach is not sufficient to establish a violation of
> CUTPA, particularly where the count alleging CUTPA simply incorporates
> by reference the breach of contract claim and does not set forth how or in
> what respect the defendant's activities are either immoral, unethical,
> unscrupulous or offensive to public policy."

Boulevard Assocs. v. Sovereign Hotels, Inc., 72 F.3d 1029, 1039 (2d Cir. 1995);

see also Robert M. Langer, et al., in 12 Conn. Prac., Unfair Trade Practices § 4:3,

Contractual Relations ("In order for there to be a CUTPA violation, the breach

must be accompanied by sufficient or substantial aggravating circumstances,

which requires more than just a failure to perform").

Count Five of the plaintiffs' Amended Complaint largely incorporates the

factual allegations of its breach of contract counts: namely, that Leprino breached

an implied in fact distribution or supply agreement by abruptly terminating its

relationship and declining to offer Q4 pricing information, and by not allowing UNI

to "roll over" its Q1 and Q3 orders.  See Am. Compl. at 53.  UNI does not raise

any public policy grounds of "unfairness" that would satisfy the Cigarette Rule

aside from its contractual relations with UNI.  Thus the court will apply the rule

that requires a plaintiff to show both a breach, as well as "aggravating

circumstances."  Boulevard Assocs. v. Sovereign Hotels, Inc., 72 F.3d 1029, 1038

(2d Cir. 1995).  Here, however, the court has already ruled that Leprino did not

breach its contracts with UNI.  Thus, UNI's CUTPA claim fails as a matter of law.

Accordingly, the Motion for Summary Judgment is granted with respect to Counts

Four and Five of the Amended Complaint.

E.    Related Motions

In addition to their Motion for Summary Judgment, Leprino also brings a Motion

to Preclude the Expert Testimony of J. Allen Kosowsky.  <u>See</u> Mot. To Preclude.  Mr. Kosowsky is a certified public accountant, and his expert report estimates the damages that UNI suffered as a result of the breaches it alleges.  <u>See id</u>.  Because the court enters summary judgment for Leprino with respect to all five Counts of the Amended Complaint, the court deems the question of damages moot.  Thus, the Motion to Preclude Mr. Kosowsky's testimony is denied as moot.

Finally, UNI filed a Motion for the court to disregard Leprino's Response to UNI's Statement of Additional Material Facts.  <u>See</u> Mot. to Disregard.  The court recognizes that the Local Rule is silent on whether a party may respond to a statement of additional facts.  <u>See</u> D. Conn. Local R. 56.  However, here, the court's decision does not turn on the admissibility of any evidence Leprino submitted in response to UNI's Statement of Additional Facts.  Thus, the court denies this Motion as moot.

## V.  CONCLUSION

For the reasons discussed above, the defendant's Motion for Summary Judgment (Doc. No. 149) is granted.  The defendant's Motion to Preclude the Expert Testimony of J. Allen Kosowksy (Doc. No. 146), and the plaintiff's Motion to Disregard the Response of Leprino Foods Company to Plaintiff's Additional Material Facts (Doc. No. 161), are both denied as moot.  The Clerk is directed to enter judgment in favor of the defendant and close the case.

**SO ORDERED.**

Dated at New Haven, Connecticut 16th day of April 2025.


_____/s/ Janet C. Hall_____
Janet C. Hall
United States District Judge

37